LOUISVILLE & N. R. CO. v. RAILROAD COMMISSION OF ALABAMA et al.

(District Court, M. D. Alabama.   July 24, 1913.   On Application for Appeal, September 15, 1913.)

1. COURTS (§ 101*)—FEDERAL COURTS—INJUNCTIONS TO RESTRAIN ENFORCEMENT OF STATE STATUTES OR ORDERS—BY WHOM MAY BE GRANTED.

Judicial Code, § 266 (Act March 3, 1911, c. 231, 36 Stat. 1162 [U. S. Comp. St. Supp. 1911, p. 237]), as amended by Act March 4, 1913, c. 160, 37 Stat. 1013, requires the presence of three judges at the hearing of an application for an interlocutory injunction to restrain the enforcement, operation, or execution of any statute of a state by restraining the action of any officer of such state in the enforcement or execution of such statute "or in the enforcement or execution of an order made by an administrative board or commission acting under and pursuant to the statutes of such state" (the words quoted being added by the amendment) "upon the ground of the unconstitutionality of such statute." *Held*, that the amendment extends the procedure requiring three judges to applications to enjoin any order made by a state board or commission which is alleged in the application to be in violation of the federal Constitution, although the constitutionality of the statute under which the board or commission acts may not be questioned.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 344–350, 629; Dec. Dig. § 101.*]

2. CARRIERS (§ 18*)—STATE REGULATION OF RATES—INJUNCTION—CONSTRUCTION OF DECREE.

A decree of a federal court enjoining the enforcement of state statutes establishing a system of rates for freight and passengers on the ground that such system, taken as a whole, was confiscatory as applied to the complainant railroad company does not render the question of the validity of the passenger rates alone, or taken in connection with higher freight rates, res judicata, nor estop the State Railroad Commission, acting under another statute, from subsequently establishing the same passenger rates.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

3. COMMERCE (§ 10*)—REGULATION OF RATES—POWERS OF STATE—NONEXERCISE OF POWER OF CONGRESS.

In the absence of any legislation on the subject by Congress, it is within the constitutional power of a state to regulate rates to be charged by railroads within the state, and such regulation is not an interference with interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 8; Dec. Dig. § 10.*]

4. CARRIERS (§ 12*) — STATE REGULATION OF RATES — REASONABLENESS OF RATES.

Where 80 per cent. of the mileage of a railroad company in a state consists of branch lines constructed with knowledge that they would not pay a fair return on intrastate business and over which it voluntarily transports coal and ore to iron and steel mills at cost, for the purpose of developing its interstate business, it cannot attack intrastate passenger rates fixed by the state as confiscatory because its entire intrastate business does not yield a fair return on the property invested therein.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

5. CARRIERS (§ 18*)—STATE REGULATION OF RATES—PRESUMPTION OF VALIDITY.

Railroad rates established by a state legislature or duly authorized commission are presumptively reasonable and not violative of constitu-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tional rights, and hence to authorize the courts to interfere with their enforcement their invalidity must be established clearly and beyond reasonable doubt.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

6. CARRIERS (§ 12*)—STATE REGULATION OF RATES—REASONABLENESS OF RATES —VALUATION OF PROPERTY.

In estimating the cost of reproduction of railroad property, for the purpose of determining the reasonableness of rates fixed by the state, it is not permissible to be governed by the value of adjoining lands enhanced by the existence and operation of the railroad and to add to such value an extra amount which it would probably cost to acquire the lands for railroad purposes.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

7. CARRIERS (§ 12*) — STATE REGULATION OF RATES — REASONABLENESS OF RATES.

Evidence considered, and held insufficient to establish the unconstitutionality of an order of the Railroad Commission of Alabama fixing intrastate passenger rates at 2½ cents per mile on the ground that it was confiscatory as applied to complainant railroad company.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

Pardee, Circuit Judge, dissenting.

## On Application for Appeal.

8. FEDERAL COURTS—SUITS TO ENJOIN ENFORCEMENT OF STATE STATUTES OR ORDERS—PROCEDURE—APPEAL.

Where a majority of the three federal judges sitting together, as required by section 266 of the Judicial Code (Act March 3, 1911, c. 231, § 266, 36 Stat. 1162 [U. S. Comp. St. Supp. 1911, p. 236]), on the hearing of a motion for a preliminary injunction to restrain the enforcement of a state statute or administrative order establishing intrastate railroad rates, have concurred in an order denying such injunction after a hearing on the merits, they should not, pending an appeal from such order, continue in force a temporary restraining order, granted on motion of plaintiff before the hearing, not only because said section 266 expressly provides that such temporary order "shall remain in force until the hearing and determination of the application for an interlocutory injunction," but also because to continue it in force would be inconsistent with, and practically nullify, the order appealed from. (Per Shelby, Circuit Judge.)

In Equity. Suit by the Louisville & Nashville Railroad Company against the Railroad Commission of Alabama and others. On motion for preliminary injunction. Motion denied.

See, also, 196 Fed. 800.

Sydney J. Bowie, of Birmingham, Ala., and Henry L. Stone and W. A. Colston, both of Louisville, Ky., for plaintiff.

Robt. C. Brickell, Atty. Gen. of Alabama, and Samuel D. Weakley and Henry C. Selheimer, both of Birmingham, Ala., for defendants.

Before PARDEE and SHELBY, Circuit Judges, and GRUBB, District Judge.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

SHELBY, Circuit Judge. This is a supplemental bill seeking to enjoin an order of the Railroad Commission of Alabama fixing intrastate. passenger rates.

[1] The application for an interlocutory injunction was made to the District Court on the ground that the order of the Alabama Railroad Commission is violative of the federal Constitution. The District Court (Hon. W. I. Grubb presiding), pursuant to the Act of March 4, 1913, c. 160, 37 Stat. 1013, amending section 266 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1162 [U. S. Comp. St. Supp. 1911, p. 237]), called to his assistance, to hear and determine the application, Circuit Judges Pardee and Shelby. On the argument at the hearing of the application, no formal objection was made to such action of the district judge, but it was suggested by one of the solicitors for the plaintiff that the statute requiring the judge to whom the application was made to call other judges was not applicable because the prayer for injunction was not based on the ground of the unconstitutionality of a statute.

The suggestion raises a question as to the legality of the organization of the court with three judges and is the first thing to be considered.

The following are the parts of the statute most relevant; the addition made by amendment being placed in italics:

"No interlocutory injunction suspending or restraining the enforcement, operation, or execution of any statute of a state by restraining the action of any officer of such state in the enforcement or execution of such statute, *or in the enforcement or execution of an order made by an administrative board or commission acting under and pursuant to the statutes of such state*, shall be issued or granted by any justice of the Supreme Court, or by any District Court of the United States, or by any judge thereof, or by any circuit judge acting as district judge, upon the ground of the unconstitutionality of such statute, unless the application for the same shall be presented to a justice of the Supreme Court of the United States, or to a circuit or district judge, and shall be heard and determined by three judges, of whom at least one shall be a justice of the Supreme Court or a circuit judge, and the other two may be either circuit or district judges, and unless a majority of said three judges shall concur in granting such application." Judicial Code, § 266; 36 Stat. 1162; 37 Stat. 1013.

The suggestion of counsel is that the amendment left the statute still requiring that the application should be made upon the ground of the "unconstitutionality of such statute," and does not in words make it apply to the unconstitutionality of an order made by a board or commission. The intention of Congress in enacting the statute must control in its interpretation if that intention can be ascertained by an examination of the amendment in connection with the section as it stood before the amendment. The section, before amendment, required a judge, when an application was made to him for an interlocutory injunction upon the ground of the "unconstitutionality" of a statute, to call to his assistance two other judges to sit with him on the hearing of the application. The intention of the amendment was to extend the original statute so as to have it include "an order made by an administrative board or commission" acting under and pursuant

to the statutes of a state. The title of the act strongly indicates that such was the intention:

"An act restricting the issuance of interlocutory injunctions to suspend the enforcement of the statute of a state or of an order made by an administrative board or commission created by and acting under the statute of a state." 37 Stat. 1013.

When the application for the interlocutory injunction is to restrain the execution of a statute of a state, to make the statute requiring the three judges applicable, the application must be "upon the ground of the unconstitutionality of such statute." To make the words "upon the ground of the unconstitutionality of such statute" applicable literally to suits to enjoin the enforcement of an order of a board or commission would permit the amended statute to have application only when the statutes creating a commission were alleged to be unconstitutional. At the time of the passage of the amendment, the constitutionality of statutes creating such commissions was so well settled that it is clear that Congress did not have in view suits attacking such statutes. It had in mind, as the title and the act both show, the orders made by a board or commission. The amended statute, by its words, extends to an application to enjoin the enforcement of any order made by an administrative board or commission acting under and pursuant to the statutes of a state. If the words limiting the application of the amendment, when it is sought to enjoin the enforcement of a statute, to cases where it is alleged that the statute violates the Constitution, are to be applied also to cases where it is sought to enjoin an order of a commission, the word "unconstitutionality" must be made to apply to the order of the Commission and not to a statute. When the power to regulate rates is exercised by the Legislature directly, the statute, as originally enacted and as amended, is applicable when such legislation is attacked as violative of the Constitution; and when the Legislature delegates its power to regulate rates to a commission, and the order of the Commission is attacked because it is violative of the Constitution, the amendment was intended to make the procedure requiring three judges applicable. The Commission's order is the exercise of a legislative function and was thought by some to be within the meaning of section 266 as originally enacted. The amendment, at least, was clearly intended to include orders by a commission that are alleged to be violative of the Constitution. While not controlling, it may be mentioned that it appears from the discussion of the amendment in the House of Representatives, when it was on its passage, that such was there understood to be its purpose. Congressional Record (3d Session, 62d Congress, March 3, 1913) vol. 49, p. 4781. Whether the amendment extends the procedure requiring three judges to applications to enjoin every order that the Commission may make is not a question before us. It is sufficient for this case to hold that it extends to any order made which is alleged in the application for an interlocutory injunction to be violative of the federal Constitution. To hold otherwise would make the amendment practically ineffective and defeat the legislative intention.

The plaintiff, in argument, contends that it is entitled to an inter-·locutory injunction on four separate grounds, each of which will be briefly considered.

[2] 1. It is contended that the decree of this court (Hon. Thomas G. Jones, District Judge, presiding), rendered April 2, 1912, is res judicata and estops the Commission from making the order which is here sought to be enjoined.

The decree in question here is confined to fixing intrastate passenger rates. The decree which is pleaded as res judicata was one relating generally to the plaintiff's intrastate freight and passenger rates. It declared unconstitutional and confiscatory (so far as concerns the plaintiff's traffic) an act of the Legislature of Alabama of March 2, 1907, and eight acts of November 23, 1907, and parts of the Alabama Code of 1907, which re-enacts those acts. It was decreed that each of these acts was confiscatory when taken "in connection with the other rate acts" affected by the decree. The decree also specifically condemns as confiscatory the act of the Alabama Legislature fixing a maximum intrastate passenger rate of 2½ cents per mile. The statute fixing this rate is so condemned "when taken in connection with the other rates covered by the decree." This decree is still in force; no appeal having been taken from it. The plaintiff, after the decree, re-established and now has in effect its higher freight rates, which it enforced before the enactment of the legislation which the decree declared confiscatory. The decree set up as res judicata only condemned the intrastate passenger rates when taken in connection with the other rates also condemned in the same decree. It was not adjudged that the intrastate passenger rates, taken in connection with the higher freight rates re-established by the decree, were confiscatory. To hold that the decree was res judicata of this controversy would be, in effect, to declare that it debarred the Commission from ever afterward fixing rates; that it permanently deprived the Commission of authority to regulate rates. That the District Court had no authority to do this was decided without dissent (on this question) in Railroad Commission v. Central of Georgia Railway Co., 170 Fed. 225, 240, 95 C. C. A. 117. The decree of the District Court invalidating the Alabama statutes fixing freight rates entirely changed the situation. Even if the 2½-cent passenger rate were confiscatory, taken in connection with those statutes, it might not be now, taken in connection with the higher freight rates and the changed conditions. The Commission, in fixing the rate in question here, was not acting under the statutes declared by the decree void as against the plaintiff, but it was acting under the Alabama statutes creating the Commission and conferring on it generally the authority to regulate intrastate rates. Louisville & Nashville Railroad Co. v. Railroad Commission of Alabama (by Hon. W. I. Grubb, District Judge, May 5, 1913) 205 Fed. 800. The former decree does not estop the Commission from making the order in suit here.

[3] 2. It is contended that the order of the Commission should be enjoined because it is a burden on or an interference with interstate commerce.

The Commission's order relates only to intrastate passenger rates, fixing the rates to be charged between points within the state. It seems well settled that the state, acting by its Legislature or by Commissions created by it, may, within constitutional limits, regulate rates to be charged within the state. Congress has not yet authorized the Interstate Commerce Commission to regulate intrastate rates on interstate roads. Unless the state has such authority, it does not exist at all under legislation now in force. The states have exercised such authority ever since the building of railroads was begun in the United States. The fact that the Commission's order may incidentally, but not materially, affect interstate commerce does not make it invalid or subject to be enjoined. Simpson et al. v. Shepard, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511.

3. It is contended that the order should be enjoined because it was made without proper notice to the plaintiff; that it was not granted an opportunity to defend. The record refutes this contention because it shows that the procedure conformed to the Alabama statutes, which the Circuit Court of Appeals for this circuit, without dissent (on this point), has held to be valid and constitutional. Railroad Commission v. Central of Georgia Railway Co., 170 Fed. 225, 240, 95 C. C. A. 117. Notice was given the plaintiff in conformity to the Alabama statutes, and a formal hearing was had, at which the plaintiff offered evidence bearing on the issues involved. There was no want of legal formalities in the procedure before the Commission.

[4] 4. The fourth and chief contention of the plaintiff is that the intrastate passenger rate fixed by the Commission is confiscatory, not allowing an adequate return on the plaintiff's · property devoted to the public use, and that the Commission's order is therefore violative of the federal Constitution.

If the order made by the Commission had fixed a general schedule of rates covering the intrastate operations of the carrier taken as a whole, this contention would certainly present the controlling question. Such question was presented in Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, and in Simpson et al. v. Shepard, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511. The controlling question in such cases is whether or not the state has overstepped the constitutional limit and made the rate so low as to deprive the carrier of its property without due process of law. This case (the case made by the supplemental bill) is to be distinguished from cases which involve all or practically all of .the intrastate passenger and freight rates charged by a railroad. The order sought to be enjoined, and which is the only subject of controversy before us, requires the plaintiff to put into effect in Alabama an intrastate passenger rate of 2½ cents a mile for adults and 1¼ cents a mile for children. The great volume of evidence submitted relates to the issue, necessarily involved in the main case, as to whether or not the railroad was earning under the general schedule of rates then in question a fair return on the value of its property devoted to intrastate public service. The solution of that question in favor of the plaintiff would not be conclusive against the defendants in the instant case, be-

cause it is limited to intrastate passenger rates. It might be true that the plaintiff would fail to secure an adequate return on all of its property devoted to the public intrastate service, and yet the failure might not be due to the passenger rate. If the return were insufficient on the whole property, the passenger rate would not be made invalid unless it materially contributed to cause the insufficiency. It follows that, to attack the order successfully, the insufficiency of the return must be shown and also that the order as to passenger rates is at fault in causing the insufficiency. If the insufficiency of the return were proved according to rules hereinafter stated, if it appears that such insufficiency is caused by the policy of the plaintiff in operation and investment and not by the rates attacked, the rule of adequate return would be inapplicable. The plaintiff cannot be permitted to cause the failure of return by its own acts and then complain of it. For the encouragement of the manufacture of iron and its products in the Birmingham district, the plaintiff carries coal, ore, and limestone at cost, or at a loss, so far as intrastate traffic is concerned. This traffic carried without profit constitutes more than 75 per cent. of all the plaintiff's intrastate tons in Alabama. Eighty per cent. of the plaintiff's mileage in Alabama consists of branch lines, constructed, it is shown, with knowledge that they would not pay from intrastate business a fair return upon their value. The policy of building them was commendable and liberal, and also wise, because they greatly contribute to the interstate traffic. The policy shown by this management and investment has been of vast value in the development of the state and probably to the great advantage of the plaintiff's stockholders, but the public cannot be burdened by an unreasonable intrastate passenger rate to make up for losses on intrastate traffic voluntarily incurred with a view to the future or to the development of interstate traffic. Under the circumstances, we would be reluctant to hold that the order fixing a passenger rate only is confiscatory because the plaintiff fails, if it does fail, to receive an adequate return on all of its property devoted to intrastate public service. Minnesota & St. Louis R. R. Co. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 412, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Covington, etc., Turnpike Co. v. Sandford, 164 U. S. 578, 596, 17 Sup. Ct. 198, 41 L. Ed. 560; San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 447, 23 Sup. Ct. 571, 47 L. Ed. 892. See 20 Interst. Com. Com'n R. 342.

[5] In deciding the question whether or not an order made by authority of the state, fixing rates, is confiscatory, the inferior courts, as to the measure of proof, are guided by well-settled rules, binding on them because announced by the Supreme Court. One of those rules is that the rate fixed by legislative authority is prima facie fair and just. The rate having been fixed by a commission vested with legal authority, the presumption must be indulged at the outset that it is reasonable and not violative of constitutional rights. The burden of proof is placed on the plaintiff to show that the case is one calling for judicial interference with the authorized action

of the local authorities. Louisiana R. R. Commission v. Cumberland Tel. Co., 212 U. S. 414, 29 Sup. Ct. 357, 53 L. Ed. 577; Minneapolis & St. Louis R. R. Co. v. Minnesota, 186 U. S. 257, 264, 22 Sup. Ct. 900, 46 L. Ed. 1151. Another rule for our guidance is that the burden of proof is not only placed on the plaintiff but that the plaintiff is required to do more than offer a mere preponderance of evidence. The judiciary is not permitted to interfere with the rates established by legislative authority unless it is made to appear clearly and beyond reasonable doubt that they are unreasonable and that their enforcement would be equivalent to the taking of property for public use without just compensation. If the evidence offered leaves the court in doubt, if it is not clear, satisfactory, and convincing, the rate fixed by state authority should not be enjoined. San Diego Land Co. v. National City, 174 U. S. 739, 754, 19 Sup. Ct. 804, 43 L. Ed. 1154; St. L. & San Francisco Ry. Co. v. Gill, 156 U. S. 649, 666, 667, 15 Sup. Ct. 484, 39 L. Ed. 567. So stringent are these rules against the interference with the action of the local authorities in fixing rates that it has been said that the court should not enjoin a rate unless it can hold "that it was impossible for a fair-minded board to come to the result which was reached." Knoxville v. Water Co., 212 U. S. 1, 17, 29 Sup. Ct. 148, 153 (53 L. Ed. 371).

These rules are not mere cautionary phrases. They are intended to mark the limits of judicial interference. If the inferior courts will regard these principles, not as platitudes, but as rules prescribed for their guidance, it will greatly lessen legislation and litigation in relation to the regulation of the tariffs of public service corporations.

Conceding that this case should be considered as one controlled by the rule of adequate return on investment, the question arises as to the sufficiency of the evidence offered to show that the order is confiscatory.

The first step in the proof required of the plaintiff is to show the value of the property upon which a return is claimed. If such value is unduly inflated, all calculations based on it are misleading. The plaintiff estimates the total value of its property devoted to public use in Alabama at $42,750,933.08. This value is stated in affidavits and is referred to as being the same found by the special master in the main case. It is not practicable to refer to all the items about which there is controversy included in this valuation, but the principle upon which the evidence as to value was received and upon which it is now offered is best shown by an excerpt from the special master's report:

"The first objection is that the estimate of the Chief Engineer was made in 1907, when the prices were higher than for previous years, and it is insisted that the prices should have been on the average prices for a series of years. But it appears that the law contemplates values at the time of the controversy, and the proof shows that prices have a general tendency to higher levels, and distinctly shows that the reconstruction would now cost as much as the estimates amount to.

"The next point is that in reproduction the enhanced value of property for 50 or a 100 years, caused, amongst other things, by the facilities furnished by the road, is not to be considered. But there is no known method of determining the share of development of a country assignable to the existence of

a particular market facility. And, besides, the road is entitled to all enhancement of values. If values decline, the road is the loser; if they advance, the road is entitled to the benefit. So it is declared, and, seemingly, with justice.

"The road as it exists has value from every incident of situation which affords opportunity to earn an income. And the right of way on reproduction for rate determination obviously must include every such surrounding. The new road is to be the 'forced heir' of the old road, vanishing in imagination as the new is constructed. And the enhancement of values includes and represents such advantages as time has given to the location.

"The present right of way is an artery and vein of commerce, receiving and imparting its current from and to the adjacent and connecting country, by and through infinite smaller connections. And the new road succeeds to the situs without losing a drop of blood (commerce). And all enhancement of prices is an inherent constituent of the situs."

The following is an excerpt from the opinion in the Minnesota Rate Cases, which deals with the same subject:

"And where the inquiry is as to the fair value of the property, in order to determine the reasonableness of the return allowed by the rate-making power, it is not admissible to attribute to the property owned by the carriers a speculative increment of value, over the amount invested in it and beyond the value of similar property owned by others, solely by reason of the fact that it is used in the public service. That would be to disregard the essential conditions of the public use and to make the public use destructive of the public right.

"The increase sought for 'railway value' in these cases is an increment over all outlays of the carrier and over the values of similar land in the vicinity. It is an increment which cannot be referred to any known criterion but must rest on a mere expression of judgment which finds no proper test or standard in the transactions of the business world. It is an increment which, in the last analysis, must rest on an estimate of the value of the railroad use as compared with other business uses; it involves an appreciation of the returns from rates (when rates themselves are in dispute) and a sweeping generalization embracing substantially all the activities of the community. For an allowance of this character there is no warrant.

"Assuming that the company is entitled to a reasonable share in the general prosperity of the communities which it serves, and thus to attribute to its property an increase in value, still the increase so allowed, apart from any improvements it may make, cannot properly extend beyond the fair average of the normal market value of land in the vicinity having a similar character. Otherwise we enter the realm of mere conjecture. We therefore hold that it was error to base the estimates of value of the right of way, yards, and terminals upon the so-called 'railway value' of the property. The company would certainly have no ground of complaint if it were allowed a value for these lands equal to the fair average market value of similar land in the vicinity, without additions by the use of multipliers, or otherwise, to cover hypothetical outlays. The allowances made below for a conjectural cost of acquisition and consequential damages must be disapproved; and, in this view, we also think it was error to add to the amount taken as the present value of the lands the further sums, calculated on that value, which were embraced in the items of 'engineering, superintendence, legal expenses,' 'contingencies,' and 'interest during construction.'

"By reason of the nature of the estimates and the points to which the testimony was addressed the amount of the fair value of the company's land cannot be satisfactorily determined from the evidence, but it sufficiently appears, for the reasons we have stated, that the amounts found were largely excessive." Simpson et al. v. Shepard, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511.

The underlying principles upon which the plaintiff has proceeded to establish the values upon which it claims adequate return cannot be

reconciled with the quoted declarations of the Supreme Court. The aggregate value, as proved by the plaintiff, includes $1,416,182.12 for interest during construction, about $600,000 for engineering, superintendence, and general expenses, more than a million dollars for "seasoning" of roadbed, and other sums amounting in the aggregate to about $6,000,000, which, it seems, would be of doubtful admissibility under the principles announced in the Minnesota Rate Cases.

[6] But it is a matter of more importance that the total valuation is greatly augmented by the course pursued in placing estimates on the real estate, including the right of way. While no direct reference is made to valuation for "railroad purposes," it appears that the lands were valued without regard to the "normal market value of the land in the vicinity having a similar character." In estimating the cost of reproduction, it does not seem to be permissible to be governed by the value of adjoining lands enhanced by the existence and operation of the railroad, and to add to such value an extra amount that it would probably cost to acquire the lands for railroad purposes. It cannot be ascertained from the record what the value is on the basis of the fair market value of similar lands in the vicinity.

In some way the value of the property must be proved. It would not be now claimed that the carrier had the unqualified right to make charges to produce a return on the face value of its stocks and bonds. It would seem equally unjust to permit the carrier to make charges to produce a return on the investment of a surplus acquired by unreasonable tariffs, for that would be to base the right to commit a second wrong upon the successful imposition of the first.

Proof of the value of the property devoted to public intrastate use is only one step, and not the most difficult one, in the case. To sustain its contention, the plaintiff must offer evidence to show the cost of the intrastate and interstate traffic. The cost of freight and passenger traffic must then be separated. Any desired result may be proved by figures if the one making them is permitted to arbitrarily select the predicate upon which to base his calculations. When the division of the expenses is based chiefly on opinion or on limited investigation made with the view of obtaining desired results to be used in pending litigation, we should hesitate to hold it convincing within the rules requiring strict proof of confiscation.

The extreme difficulty and intricacy of making the calculations and proof would indicate the necessity of a system of account keeping on which to base them (Allen et al. v. St. Louis, Iron Mountain & Southern Ry. Co., 230 U. S. 553, 33 Sup. Ct. 1030, 57 L. Ed. 1625, June 16, 1913); but the difficulties do not relieve the plaintiff of the burden. The method used by the plaintiff to ascertain the per cent. to be applied to freight haulage and passenger haulage expenses is the result of a test made during one week in September, 1907, to ascertain the relative train cost of an interstate ton mile and an intrastate ton mile, and the relative train cost of an interstate passenger mile and an intrastate passenger mile. Men rode on the plaintiff's trains in Alabama for that week and gathered data. From information so obtained and from conductor's reports, it was ascertained what busi-

ness was done, interstate and intrastate, during that week. With respect to passenger traffic during that week, the number of intrastate and interstate passengers were counted and the number of intrastate and interstate passenger miles ascertained, and the train cost of each calculated. The train cost during this week of an intrastate passenger mile was 5.68 mills, and the train cost of an interstate passenger mile was 3.15 mills; and the ratio was thus fixed that the train cost of an intrastate passenger mile was, for that week, 180.317 per cent. of the train cost of an interstate passenger mile. The plaintiff's subsequent calculations and estimates proceed upon the hypothesis that the same ratio exists with respect to the train cost in the total intrastate and interstate passenger miles for each of the entire fiscal years involved in the investigation. The effect of this method was to burden intrastate traffic with approximately 70 per cent. of the entire cost of operation.

The plaintiff attempted to do in one week what could only be done by "prolonged and minute investigation of particular facts with respect to the actual traffic as it was being carried over the line." The result of the calculations relating to adequate return depend on this ratio. Can a ratio thus obtained be accepted as sufficient to sustain a finding of confiscation? An answer to this question is at least indicated by the Supreme Court (italics ours):

"The statements of the complainants' witnesses *as to the extra cost of intrastate business*, while entitled to respect as expressions of opinion, manifestly involve wide and *difficult generalizations*. They embrace, without the aid of statistical information derived from appropriate tests and submitted to careful analysis, a general estimate of all the conditions of transportation, and an effort to express *in the terms of a definite relation, or ratio*, what clearly could be accurately arrived at *only by prolonged and minute investigation of particular facts with respect to the actual traffic as it was being carried over the line*. The extra cost, as estimated by these witnesses, is predicated not simply of haulage charges but of all the outlays of the freight service, including the share of the expenses for maintenance of way and equipment assigned to the freight department. And the ratio, to be accurately stated, must also express the results of a suitable discrimination between the interstate and intrastate traffic on through and local trains respectively, and of an attribution of the proper share of the extra cost of local train service to *the interstate traffic that uses it*. The wide range of the estimates of extra cost, from three to six or seven times that of the interstate business per ton mile, shows both the difficulty and the lack of certainty in passing judgment.

"We are of opinion that on an issue of this character, involving the constitutional validity of state action, *general estimates of the sort here submitted*, with respect to a subject so intricate and important, should not be accepted as adequate proof to sustain a finding of confiscation. *While accounts have not been kept so as to show the relative cost of interstate and intrastate business, giving particulars of the traffic handled on through and local trains, and presenting data from which such extra cost as there may be of intrastate business may be suitably determined, it would appear to have been not impracticable to have had such accounts kept or statistics prepared, at least during test periods, properly selected*. It may be said that this would have been a very difficult matter, but the company, having assailed the unconstitutionally of the state acts and orders, was bound to establish its case, and it was not entitled to rest on expressions of judgment *when it had it in its power to present accurate data which would permit the court to draw the right conclusion*." Simpson et al. v. Shepard, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511.

In the Missouri Rate Cases brief tests were given no weight but were discarded with the single remark:

"There was also testimony on each side as to certain tests, but these covered only a few days." Knott et al. v. Chicago, Burlington & Quincy R. R. Co., 230 U. S. 474, 33 Sup. Ct. 975, 983, 57 L. Ed. 1571, June 16, 1913.

The contention is that the plaintiff, at the rate in question, carried passengers at a great loss. If that be true, under the rule which shows such loss, what rate per mile for carrying a passenger would the carrier have to charge in order to earn 8 per cent. on that part of its investment devoted to intrastate service?

[7] The decision of this case should not be controlled by artificial rules and formulas, but there should be "a reasonable judgment having its basis in a proper consideration of all relevant facts." There are several facts shown by the record which, while not controlling, are worthy of mention. There are a number of railroads besides the plaintiff's in operation in Alabama, and it appears that 55 per cent. of the mileage in Alabama, including all of the railroads in the state, have had for the last five years, and now have, a regular passenger rate of 2½ cents a mile, and that they issue a penny scrip book, and that passengers who use it pay only 2 cents a mile. And the plaintiff sells a penny scrip book for $20 to be used in one year, by using which passengers pay only 2.40 cents a mile. It is true that to obtain the lower rate the purchaser must pay $20 in advance. The fact that such low rates are given by the plaintiff on the conditions prescribed would not make valid the rates fixed by the commission if they were, in fact, confiscatory. Lake Shore, etc., Railway Co. v. Smith, 173 U. S. 684, 697, 19 Sup. Ct. 565, 43 L. Ed. 858. But it is difficult to believe that the plaintiff would make these contracts of carriage at less than 2½ cents a mile, if, in fact, a rate of 2½ cents a mile were confiscatory.

The record shows that the country is richer and more prosperous along the lines of the plaintiff's road than in other parts of the state. And yet the other roads have maintained the rates that are here contested for the last five years. It is true that some of these roads at first resisted the enforcement of these rates. The present conditions being the same, or at least not unfavorable to the plaintiff, it would seem not unfair, so far as the plaintiff is concerned, to make the rates uniform. Seaboard Air Line v. Florida, 203 U. S. 261, 269, 27 Sup. Ct. 109, 51 L. Ed. 175.

The record shows that passenger rates like those fixed by the order were in force on the plaintiff's road under a decision of the United States Circuit Court of Appeals in Railroad Commission of Alabama v. Central of Georgia Railway Co., 170 Fed. 225, 95 C. C. A. 117, from June 1, 1909, to April 17, 1912, and that, during the period of the enforcement of the lower rate, there was a great increase in the number of intrastate passengers and in the number of intrastate passenger miles. Tables of figures are presented showing a great yearly increase apparently under the stimulus of the lower rate. The in-

crease, it is contended by the plaintiff, was caused by interstate passengers buying tickets at the lower rate when they would reach the state line; but the evidence to that effect is not convincing. The record shows that intrastate travel was greatly stimulated by the lower rates, and that the carrier, by the reduction, cannot be said to have lost the entire difference between the higher and lower price of the increased number of tickets sold. The increase of intrastate passengers and intrastate passenger miles increased the receipts of the carrier without materially increasing its expenses, for the trains are required to make the regular trips whether they carry few or many passengers. But, if it be conceded that there was some loss of income by the change of rate, that fact of itself does not make the regulation invalid.

The ultimate question here is whether or not the rate prescribed for intrastate passengers under all the circumstances is reasonable—reasonable for the carrier and the public. The question as to whether or not, on its entire intrastate business, the plaintiff is receiving an adequate return, say 6 per cent. or 8 per cent., on its entire investment for public use is not absolutely controlling. The case is taken out of that rule, because it does not involve a general schedule of rates, and by the other particular facts of the case which have been mentioned. The question of adequate return on the entire investment involves merely one element in the solution of the ultimate question of whether or not the rate prescribed for the subdivision of the traffic is reasonable. The solution of the ultimate question depends on the particular facts of each case. The public has a right to demand that no more be exacted from it than, in view of all the facts, the services are reasonably worth. And the carrier should be protected in the right to demand what they are reasonably worth. Rates that are too low are not only unfair to the carrier but worse for the public than those that are too high, for they would ultimately prevent the operation of existing railroads and forbid the building of new ones. The fact that only passenger rates are involved, and the circumstances, to which reference has been made, that the plaintiff, for reasons which are, perhaps, commendable, carries a large part of its freight at cost or at a loss, and has constructed many branch lines with the knowledge that they would not immediately be profitable, shows conclusively that the test of adequate return upon its whole intrastate business is not controlling in this case. Losses voluntarily incurred in one branch of its traffic cannot justly be recouped by unreasonable charges in another branch. Unreasonable intrastate passenger rates cannot be justly maintained to cover losses voluntarily incurred as a matter of policy, although the policy in itself may be wise and beneficial to the public.

The facts claimed by the plaintiff to be proved as to values and income, when taken in connection with other facts shown by the record, are not such as to call for the application of the rule that would invalidate an order fixing rates for failure to produce adequate return; and, if the case is considered as controlled by the rule relating to adequate return, the evidence is not sufficient to show the value of the plaintiff's property upon which it would be entitled to a return; nor

is it sufficient to show the separate cost of the intrastate passenger service.

The injunction should therefore be:

Denied.

GRUBB, District Judge (concurring). I desire to add a few words concerning the first and fourth grounds assigned by the plaintiff for the issuance of the temporary injunction.

First. As to res adjudicata. Upon this point the inquiry is whether the issues presented for determination under the present and second supplemental bill are identical with those determined by the final decree upon the first supplemental bill in this cause. To answer this inquiry it is necessary to ascertain what were the issues presented under the respective supplemental bills. An examination of the record in the original case convinces me that the master and the district judge found only that the system of statutory rates, comprised in the Eight Group or 110 Commodity Rate Acts, the Maximum Passenger Rate Act, and the Maximum Freight Act, was confiscatory in its operation upon the entire intrastate business of the plaintiff.

It is true that the pleadings were broad enough to present the same issue as to the operation of the 2½-cent passenger rate in and of itself, and possibly there is evidence in the record tending to establish its confiscatory nature without reference to the statutory freight rates. It is clear to me, however, that the master and the district judge did not attempt to determine the operation of the 2½-cent statutory passenger rate apart from its companion statutory freight rates. The finding of the master, approved by the court, was that the passenger rate, in connection with the freight rates, and contra, had the effect of making the entire intrastate business of the plaintiff unremunerative. This appears from the language of the master's report and of the opinion and decree of the district judge. The Supreme Court of the United States in the Minnesota Rate Cases have since determined that the problem ordinarily presented in state-made rate cases is the effect of the statutory or commission-made rates upon the intrastate business of the carrier in its entirety.

It is true that the district judge stated in the course of his opinion that the evidence showed that the passenger business of plaintiff in Alabama cost the plaintiff to earn a dollar as much or more than its freight business, from which the inference is sought to be drawn that, as the entire intrastate business was held to be unremunerative, both passenger and freight were separately so held. If the court had intended to find the effect of the statutory passenger rate, in its operation on plaintiff's intrastate business separately, it is not conceivable that it would have left this finding to be inferred. It is not contended that there was any express and explicit determination of the effect of the passenger rate as there was of the entire schedule of rates. The evidence submitted would not have enabled the master or the district judge to have made either an exact or approximate separate determination of that kind, and there had been no period of experiment of the effect of the statutory passenger rate in its operation, apart from the statutory freight rates, up to the date of the final decree. The only separation

of passenger and freight business shown by the record was merely incidental to the distribution of the plaintiff's entire business in Alabama as between intra and inter state business according to the method of plaintiff's expert accountant, whose method was adopted by the master and the district judge.

The data to enable the court to reach a correct approximate conclusion being absent from the record, and the report of the master and the opinion and decree of the district judge containing no express finding as to the separate effect of the passenger rate, it is fair to presume that none was made. The assertion in the opinion that the passenger business was not conducted more profitably than the freight business is not a finding that the 2½-cent passenger rate, apart from its connection with the statutory freight rates, so substantially contributed to a loss of revenue as to cause confiscation. It is true that the mandatory paragraph of the final decree separately enjoined the Commission from enforcing each of the rate statutes; but, upon the question of res adjudicata, this paragraph is to be controlled by the preceding paragraph which sets out explicitly the court's finding and which, properly construed, contains no such finding, but only a finding that the entire statutory system of rates, both passenger and freight when taken in connection with each other, was confiscatory.

Is the issue so found by the court the same in substance as that presented by the second supplemental bill on which the temporary injunction is now asked? It is clear that if the defendants had restored the entire statutory schedule of rates, freight and passenger, after the passing of the decree enjoining them, they could have overcome the defense of res adjudicata only by showing a change of conditions occurring since the decree, having the effect of making the plaintiff's intrastate business remunerative, at the time of such restoration, under the statutory rates. Conceding that such action could be taken under their general and independent rate-making power and without applying to the district court under the permissive terms of the decree, it could only prevail against the defense of the previous adjudication by a showing of that character. If all the rates were restored together, the one significant change of conditions (i. e., the operation of the 2½-cent passenger rate in connection with the plaintiff's voluntary and higher freight rates instead of the statutory ones) would not have occurred, and change of conditions could be predicated only upon reports of plaintiff's earnings and expenses for operations after the date of the decree, showing a different status from those considered by the court.

However, in this case the Commission restored, by the order complained of, only the passenger rate, and the final decree in the original cause, enjoining the enforcement of the statutory freight rates, left it open to the plaintiff to put in force voluntarily any freight rates that were reasonable and would prove remunerative, and it had at the time of the Commission's order availed itself of this right as to the rates affected by the Eight Group Acts. The situation which confronted the Commission when it made the order complained of was therefore a materially different situation from that which confronted

the district court when it entered the final decree in the original cause. The difference consisted in the fact that the plaintiff was then earning more on its intrastate business, by reason of the restoration of its voluntary freight rates, than it had been earning during the period of experiment from June 1, 1909, until the date of the final decree, when the statutory freight rates as well as the 2½-cent passenger rate were being enforced against it. The statutory passenger rate might well have been held to be confiscatory in its operation on plaintiff's intrastate business, when taken in connection with the reduced statutory freight rates, and yet may prove fully compensatory when taken in connection with the higher voluntary freight rates in force when the order restoring the statutory passenger rate was to take effect. This question, as well as the question as to whether the passenger rate, when considered without reference to changed conditions, contributed substantially, of itself, to reduce plaintiff's intrastate earnings below the remunerative point, have never been judicially determined as between the parties and both are open to contestation under the present bill.

Fourth. The confiscatory effect of the 2½-cent passenger rate. In order that the rate complained of be shown to be confiscatory, the plaintiff must establish: (1) That its entire intrastate business in Alabama, after the restoration of the voluntary freight rates affected by the Eight Group Acts, in connection with the enforcement of the 2½-cent passenger rate by the Commission, will prove unremunerative; and (2) that the 2½-cent passenger rate is so unreasonably low as to substantially contribute to this result.

The rate complained of is probably not entitled to the presumption of correctness which usually attends commission-made rates, in view of the fact that the opinion of the Commission shows that it reached its conclusion that the 2½-cent fare was reasonable, not by reliance upon changed conditions, shown either by the restoration by plaintiff of voluntary freight rates or by the consideration of earnings and expenses during the period between the final decree and its order, but by discarding the methods of apportionment adopted by the master and the district judge by which they arrived at the contrary conclusion, and by the adoption of different methods. While the methods of apportionment adopted by the master and the district judge on the final hearing are not conclusive on this hearing, they are entitled to as much or more weight than a finding of the Commission based on different methods of computation and apportionment, and avail to remove any presumption of reasonableness that would otherwise arise from the rate fixed by the Commission. The burden is nevertheless on the plaintiff to establish with reasonable certainty that the rate complained of is confiscatory, as is asserted in the new supplemental bill.

The plaintiff seeks to establish the proposition that, even with the higher voluntary freight rates in force, the entire intrastate business, under a 2½-cent passenger rate, would prove unremunerative by methods of computation and apportionment substantially like those used on the final hearing in the original cause, applied to statistics

of earnings and expenses reported under the operations since the final decree and since the restoration of the freight rates pursuant to its authority. On the other hand, the defendants assail the methods of the apportionment so used to ascertain the value of the property devoted to intrastate passenger business and the proportion of expense properly chargeable to it, on the grounds advanced before the district court upon the final hearing.

It cannot be true that we are concluded by the methods of apportionment adopted upon the former hearing in this cause. If it is our duty to decide the ultimate fact of the reasonableness of the $2\frac{1}{2}$-cent rate as against the defense of res adjudicata interposed by plaintiff, it is clearly our duty to decide it according to what are now correct methods of apportionment, though they may differ from those adopted upon the former hearing. This is as true of methods of apportionment as it would be true of an erroneous arithmetical rule, if such an erroneous rule had entered into the previous calculation. Any other principle could serve only to perpetuate the error, if any existed, and to render any future hearing, for this reason, a futile one. It is our duty to follow the methods of apportionment used upon the former hearing so far, and only so far, as we believe they are calculated to produce correct results and to conform to the law as it now stands.

Without entering upon any detailed analysis, I think the plaintiff's methods of apportionment of values and expenses, both as between inter and intra state business and passenger and freight business, are subject to some of the criticisms presented by defendants' counsel. The reply contention of plaintiff is that, conceding the justice of the criticisms for the sake of the argument only, they are not of sufficient importance to change the result; that there were omitted items, now supplied, and to credit for which plaintiff is entitled, that more than offset the errors on the other side; and that the confiscation is so palpable that erroneous methods, if they exist, may be safely ignored, as was done by the Supreme Court in certain of the recently decided rate cases.

After a full study of the record and briefs, I am not reasonably satisfied that the plaintiff's methods of apportioning values and expenses as between passenger and freight and inter and intra state business are calculated to produce the certain results that are now exacted of a common carrier, seeking the aid of a court to restrain the enforcement of statutory or commission-made rates, by the decisions of the Supreme Court in the Minnesota, Missouri, and Arkansas rate cases, recently decided. The difficulty, if not the impossibility, of reaching the requisite certainty, as intimated in these decisions, in the absence of accounts currently kept by the carrier, showing the result of operations properly distributed, is emphasized by the necessity for the double distribution between freight and passenger and between inter and intra state business which the exigencies of this case require and by the fact that the proof on which the ascertainment rests on this application consists of ex parte affidavits, not contradictorily taken.

Upon the values used upon the former hearing, without correction and upon the defendants' computation and division of expense between passenger and freight traffic, the entire passenger traffic of plaintiff in Alabama would yield a return slightly in excess of 8 per cent., and upon the defendants' corrected values a return of 7.22 per cent. On the other hand, the plaintiff, by its values and methods of division, reaches the conclusion that it receives no substantial return upon its passenger business, inter and intra state, in Alabama. This is not a case, therefore, where methods of division can be ignored, since the question of confiscation depends upon which of the values and methods is to be adopted by the court as the correct one.

The plaintiff must also reasonably satisfy the court of the second proposition that any deficiency in intrastate earnings below the point of remuneration, that may exist, is substantially contributed to by the enforcement of the reduced passenger rate. That rate cannot be said to be so unreasonably low as to be confiscatory, unless its operation is attended with that result. Even though the intrastate earnings have reached the unremunerative point, it does not follow that every rate reduction thereafter is an act of confiscation. It is conceivable that the reduction of a specific rate may be inconsequential in its effect on the entire intrastate business, or at least of not sufficient consequence to constitute confiscation, or that, by increasing the amount of business done at the lower rate, it may be attended with no loss of earnings or even with an increase. In such a case the fact that the entire intrastate earnings of a carrier did not, either before or after the reduction, yield a fair return would not condemn the reduced rate.

If the record in this case shows no substantial loss in plaintiff's passenger earnings attending the reduction of the passenger rate, while it was enforced, as compared with the periods when the 3-cent rate was effective, it will satisfactorily appear that there was no confiscation. A conclusion upon this question may be reached upon admitted facts and figures without resort to complicated and disputed methods of apportionment. A comparison of the annual gross passenger earnings of the plaintiff's railroad in Alabama from the fiscal year ending June 30, 1907, up to February 28, 1913, the last month available, as reported by the plaintiff, will serve to show the effect of the operation of the two rates. Of this period the 3-cent fare was in force from July 1, 1907, to June 1, 1909, and from April 17, 1912, to February 28, 1913, and the 2½-cent fare was in force from June 1, 1909, to April 17, 1912. A tabulated statement of reported gross passenger earnings for the fiscal years 1907, 1908, 1909, 1910, 1911, and 1912, showing intrastate, interstate, and total separately is appended.

Passenger Revenue.

|  | Interstate. | Intrastate. | Total. |
|---|---|---|---|
| Fiscal year ending June 30, 1907..... | $764,300.78 | $1,119,583.93 | $1,883,884.71 |
| Fiscal year ending June 30, 1908..... | 797,315.56 | 1,087,558.44 | 1,884,874.00 |
| Fiscal year ending June 30, 1909..... | 785,028.30 | 918,117.59 | 1,703,145.72 |
| Fiscal year ending June 30, 1910..... | 823,171.86 | 972,717.42 | 1,795,889.28 |
| Fiscal year ending June 30, 1911..... | 854,563.34 | 1,072,605.07 | 1,927,168.41 |
| Fiscal year ending June 30, 1912..... | 929,023.20 | 1,167,697.77 | 2,096,720.97 |

The fiscal years 1907, 1908, and 1909 (except one month) are years during which the 3-cent fare was operative. The fiscal years 1910, 1911, and 1912 (except 2½ months) are years in which the 2½-cent fare was operative.

Inspection of the table shows that the interstate gross passenger earnings of plaintiff have increased each fiscal year during the series, without exception; that intrastate passenger earnings decreased from the year 1907 progressively until the year 1910 and from that year progressively increased each year, until for the year 1912 they had passed the high-water mark of the year 1907. Total passenger earnings of plaintiff in Alabama decreased for the years 1909 and 1910 over the years 1907 and 1908, which were substantially alike, and beginning with the year 1910 progressively increased, until for the year 1912 the total earnings in Alabama exceeded those for the year 1907 by $212.826.26. In the same year (1912) the interstate passenger earnings in Alabama exceeded interstate passenger earnings for the year 1907 by $164,722.42, and the intrastate passenger earnings for 1912 exceeded those for 1907 by $48,113.84. The 2½-cent rate was in effect the fiscal year ending June 30, 1909, up to April 17, 1912. The year ending June 30, 1907 was the most prosperous year the railroads of the country have experienced. It was followed by the panic of October, 1907, and the panic years of 1908 and 1909. Earnings during the panic years were naturally abnormally small, and a comparison of the year 1907 with those years would be misleading. The year 1912 was a typical year of prosperity and affords a fair year of comparison with the last preceding year of prosperity, which was 1907. Such a comparison shows that passenger earnings under the 2½-cent rate for both inter and intra state traffic were materially in excess of those for this most prosperous previous year. It is true that, if a normal increase had been added each year to the previous year from 1907 to 1912, the excess of 1912 over 1907 would have been much greater, but the intervening panic years account for the absence of continuous normal increases during the period of comparison. It does not seem that confiscation can be predicated upon a rate which, during the last year it was effective, produced an increase in intrastate earnings over the intrastate earnings of the preceding most prosperous year, and which did this, not only without causing a reduction in interstate passenger earnings for the same year, but when these earnings were also greatly in excess of those of the same prosperous year of comparison. Whether this result was obtained by a stimulation of passenger business due to the reduced fare or to the normal growth of the tributary country during the intervening years, or to the increase of travel always attendant upon the return of good times, it remains true that for some reason the conditions in 1912 were such that plaintiff could conduct its passenger business in Alabama, under the reduced rate, with results that compared favorably with its passenger earnings for the most prosperous year in the history of our railroads, and hence without confiscation.

The same rate produced the following increases in intrastate gross passenger earnings during each of the three years of the period of its operation over the preceding year:

1910 over 1909.................................................... $54,599.83
1911 over 1910.................................................... 99,887.65
1912 over 1911.................................................... 95,092.70

—as compared with decreases for the years 1909 over 1908 and 1908 over 1907 when the 3-cent fare was effective. However, these, as stated, were panic years and not fair standards of comparison.

The aggregate increase on plaintiff's intrastate gross passenger earnings for the three years when the 2½-cent fare was effective was $249,488.18. During the same period the interstate gross passenger earnings increased $143,994. The total passenger returns for the plaintiff in Alabama increased $393,575.08. Percentages of increase were respectively 27.2 per cent., 18 per cent., and 23.1 per cent for intra, inter, and total passenger receipts.

It may be true that the increase in intrastate earnings for the first year during which the 2½-cent rate was effective over the last year the 3-cent fare was effective was partly at the expense of the interstate earnings through the custom of the interstate passengers rebuying tickets at stations near the Alabama state line to get the benefit of the reduced Alabama rate, as is shown by the reduced comparative increase in interstate earnings for that year. However, the increase of the second year in which the reduced rate was effective over the first and of the third year over the second (which were each in greater amount) cannot be so accounted for, since the same fare was in effect during each of those years. The motive that induced interstate passengers to avoid paying the 3-cent fare by rebuying their tickets at state line stations, with the incident trouble of rechecking baggage when they had any, would also tend to induce intrastate passengers to travel as infrequently and as few miles as possible and so tend to restrict intrastate passenger travel under the 3-cent fare, and for a like reason the reduced 2½-cent rate would to some extent stimulate such travel. However, it is not necessary to attribute the admitted increase in passenger travel to the reduced rate. It concededly exists, and, whatever may be its cause, it avails to show that a rate under which such returns are possible cannot be now confiscatory, whatever might have been said of it under previous conditions of traffic. Otherwise reductions of passenger rates would never be justified because of increased earnings due to increased population and denser traffic conditions, such as appear from the affidavits of plaintiff's witnesses to have obtained on its line in Alabama. So the percentages of increase might or might not have been greater under a 3-cent fare, dependent upon how much or how little the increase was due to stimulation caused by the lower rate; but in view of the very substantial absolute increase in each class of passenger earnings over each preceding year, bringing them finally above all previous records, confiscation cannot be predicated merely on diminished percentages of increase over what might have obtained under the 3-cent fare.

It is contended that the 3-cent fare itself did not yield a fair return on the property devoted to intrastate passenger business, and so affords an improper basis for comparison. It is, however, voluntarily maintained in other states by the plaintiff and was voluntarily fixed by it as the uniform rate for its branch and main lines in Alabama and is the maximum passenger rate in all parts of the United States with few and restricted exceptions. If the plaintiff's methods of apportionment show the 3-cent fare to be unremunerative, it argues that such methods may prove too much. Increased gross earnings under the lower rate might be handled at so great an increased expense as to make the returns unremunerative on the increased business. The record shows, however, that the intrastate passenger trains of plaintiff were never filled to their capacity before the time of the final hearing and so could accommodate the increased travel with little additional expense. It shows also that but two new trains were added during the period of comparison; that they were both interstate trains, not essential for the accommodation of intrastate passengers; and that the additional train cost, outside of these two trains, was small. The expense, other than the train cost, including terminal expense, of the increased travel is obviously small. So that the increases in gross earnings under the reduced rate would not be consumed to any appreciable extent by increased expenses caused by its handling.

A comparison of results of operation after the 3-cent fare was restored on April 17, 1912, and until February 28, 1913, the last available month, with the earnings for the corresponding periods while the 2½-cent rate was in force, shows no such differences as would indicate confiscation. They are as follows:

### Intrastate Passenger Revenue.

| | |
|---|---|
| May, 1909, to February, 1910 | $ 791,108.84 |
| May, 1910, to February, 1911 | 886,106.05 |
| May, 1911, to February, 1912 | 967,672.15 |
| May, 1912, to February, 1913 | 1,056,682.99 |

### Increases in Intrastate Passenger Revenue.

| | In Dollars. | In Percentage. |
|---|---|---|
| 1910–11 over 1909–10 | $94,997.21 | 12.08 |
| 1911–12 over 1910–11 | 81,566.10 | 9.20 |
| 1912–13 over 1911–12 | 88,610.84 | 9.16 |

The increase in revenue since May 1, 1912, with the added ½-cent due to the increase in rate, is below the normal in percentage and not substantially above the average of increase for the two years next preceding, in amount. If the restoration of the 3-cent fare has worked no greater differences than these in plaintiff's intrastate earnings, it is difficult to understand how the 2½-cent fare can be held to be confiscatory.

For the reasons assigned in the opinion of Circuit Judge Shelby and those herein expressed, whatever conclusion may be reached upon the final hearing after fuller presentation and by witnesses subjected to cross-examination, I am of the opinion that the plaintiff, at this stage of the cause, has not shown with the degree of certainty

now exacted of it in this class of cases that the rate complained of would be confiscatory if put in present operation.

NOTE.—See, also, Seaboard Air Line Ry. v. R. R. Commission of Alabama (C. C.) 155 Fed. 792; Louisville & N. R. Co. v. Railroad Commission of Ala. (C. C.) 157 Fed. 944; Central of Ga. Ry. Co. v. Railroad Commission of Ala. (C. C.) 161 Fed. 925; Louisville & Nashville R. R. Co. v. Railroad Commission of Alabama, 170 Fed. 225, 95 C. C. A. 117; South & N. A. R. Co. v. Railroad Commission of Ala. (C. C.) 171 Fed. 225; Louisville & Nashville R. R. Co. v. R. R. Commission of Alabama (D. C.) 196 Fed. 800; Louisville & N. R. Co. v. R. R. Commission of Ala. (D. C.) 205 Fed. 800.

PARDEE, Circuit Judge (dissenting).   The act of Congress providing for the calling in of two judges in certain applications for temporary injunctions is a restrictive statute, not at all flattering to the intelligence and impartiality of the District Judges of the country, and it does not in my judgment call for a liberal construction, and so I am not inclined to broaden the statute to cover a supposed intention of the lawmaker, but rather disposed to leave the matter to the Supreme Court, and in the meantime hold that the eminent lawyers in the judiciary committee of Congress who framed the same meant exactly what they said and said exactly what they meant.

I appreciate the force of Judge SHELBY'S reasoning in regard to the proper construction to be given to the statute, and under the peculiar circumstances of this case I am not disposed to make any further point in the matter.

Whether, in view of the previous and just concluded litigation between the same parties, the Railroad Commission of Alabama had a right to disregard the final decree rendered in the case and pay no attention to the seventh paragraph thereof (a paragraph, by the way, that the Supreme Court in former decisions and in the lately decided railroad cases seems to think of some force, and a necessary part of a like degree), has, I understand, been substantially passed upon by Judge GRUBB, and therefore I am disposed to accept Judge SHELBY'S conclusions in that respect, and make no point against the same, although fully satisfied that it would have been more respectful and seemly if the Railroad Commission had made application to the court under the seventh paragraph of the final decree, alleging changed conditions and asking proper relief.

The supplemental bill brings before us at this hearing the entire litigation between the parties, and it seems to me that at this time, and acting on this application for an interlocutory order, all the matters in contest in the main case and settled by the decree rendered are for the present inquiry res adjudicata; and no presumption in favor of the action of the Railroad Commission, and no presumption generally in favor of statutory boards, can now be interposed to reopen any of the issues that were passed upon and decided in the aforesaid final decree.   And if there were any presumptions to be indulged on this hearing, they preponderate on the side of the complainant, who is en-

titled to all the results coming from adjudicated issues in the main case. If anything was settled in the main case, it was the value of the property of the complainant in the state of Alabama employed in intrastate traffic, and following that, and incidental to the determination of the issues in the case, the apportionment of the use of the property as between freight and passenger traffic.

As I read the final decree, which is a part of the law of the case we are now considering, the court decided that the statute requiring a maximum 2½-cent passenger rate on the complainant's railway and branch lines in Alabama was *void*, as confiscatory, and necessarily in and of itself *void*. It is not to be presumed that the court could or would declare a statute of the state void which was not tainted with unconstitutionality. I paid attention to the argument (not, however, based on facts as found by the master and approved by the court) that the 2½-cent statute was only decreed void as a part of a system, and I think the same without force. Every statute of a state is part of a system of all the laws of the state, and there is nothing in the act which, as one dealing with one only subject, shows it was to stand or fall with other statutes passed by the same Legislature.

With this preliminary the question before us is whether, on the record and showing made by the parties, a case has been made which entitles the complainant to an injunction maintaining the status quo pending a final hearing upon the issues presented by the bill. Certainty that the complainant will recover on final hearing is not called for. Decided probability, based on the facts presented, is all that we are expected to require on this hearing. The evidence before us is voluminous, general, specific, and detailed, involving matters of the building, costs, expenses, receipts and disbursements, maintenance, and operation of the complainant's railway and numerous branches, intrastate and interstate, in Alabama, and also much of the same located in other states, and some involving costs, expenses, disbursements, and profits in practices of other railroads in and out of Alabama. To analyze the evidence at present and support my conclusions in the case will take more time than I have at my disposal or the exigencies of the case will allow (incidentally I refer to the voluminous briefs in the case); but to all these matters I have given careful examination and consideration in the light of decisions cited and all the very late decisions in rate cases by the Supreme Court of the United States, and my conclusions are that no changed conditions arising since the rendition of the final decree in the main case have been shown making a 2½-cent passenger rate reasonable and compensatory on complainant's lines, and that the complainant has made a case that entitles it to an injunction pending the suit—a case which, if as well established by evidence contradictorily taken, will entitle the complainant to relief on final hearing.

On Application for Appeal and Supersedeas, or for a Continuance of the Restraining Order Pending Appeal.

The plaintiff's petition for an interlocutory injunction having been denied, the plaintiff presented a petition praying for an appeal to the

Supreme Court and for a continuance of the restraining order heretofore granted, pending the appeal. After argument and consideration, the court entered the following order:

"This cause coming on to be heard upon the application of the plaintiff, the Louisville & Nashville Railroad Company, for the allowance of an appeal direct to the Supreme Court of the United States from an order of the District Court, composed of two Circuit Judges and a District Judge, denying the petition of the plaintiff for an injunction pendente lite, as prayed for in its supplemental bill in this cause, and upon the application of the plaintiff for a supersedeas and an order restraining the enforcement of an order of the Railroad Commission of Alabama set out in its supplemental bill;

"And the court being of opinion that, owing to uncertainty as to the proper construction of section 266 of the Judicial Code, with relation to the authority of the court to restrain the enforcement of the order, pending the appeal, and in view of the present status of the case, and the pendency of other cases that are likely to present the same question for decision, and of the importance of a final and authoritative decision thereof to the public and the litigants, the application for a supersedeas and for a restraining order would better be presented to the Supreme Court:

"It is therefore ordered that the plaintiff's application for the allowance of the appeal and for supersedeas or a restraining order against the enforcement of the order of the Railroad Commission of Alabama, pending the appeal, be denied, the court not passing upon the merits of the application, and without prejudice to the right of the plaintiff to renew its application for an appeal and for a restraining order, pending the appeal, in the Supreme Court, or as it may be advised.

"Given this 13th day of September, 1913."

SHELBY, Circuit Judge. I concur in the decree refusing to continue the restraining order pending the appeal, but I reach that conclusion from a consideration of the application on its merits. My view would lead to a denial of the application, but not to referring the motion to the Supreme Court. The plaintiff would, of course, be free to make such application to that court as it chose to make.

[8] The Railroad Commission of Alabama, by regular procedure, established for plaintiff's road an intrastate passenger rate of 2½ cents per mile for adults and 1¼ cents per mile for children. The rate in force on plaintiff's road was 3 cents per mile for adults and 1½ cents per mile for children. The plaintiff filed the present bill to enjoin the order of the Commission. The case was heard before three judges, under Judicial Code, § 266, on an application for an interlocutory injunction. The effect of the injunction, if granted, would have been to enjoin the rates fixed by the Commission and to continue in force, pending the suit, the higher rates. The court, by a majority of the judges, refused the injunction, and, on August 12, 1913, put in force the rates established by the Commission, which rates are now in force. The question of the granting of the injunction was within the judicial discretion of the court, governed by established equitable principles. In two opinions filed, the court gave reasons for the exercise of its discretion in refusing the writ. The application now before the court seeks to enjoin or stay the order of the Commission pending an appeal by the plaintiff to the Supreme Court from the order refusing the interlocutory injunction. The first application was for an injunction pending the suit which stood for trial in the District Court;

the second application is for an injunctive order pending the appeal. Relief on either application meant the suspension of the rates fixed by the Commission and the re-establishment of the higher rates fixed by the plaintiff. Both applications are urged by the same arguments and the same offer of bond. I can see no reason for granting the second application that would not have been equally applicable to granting the first. To have granted the first would not have delayed a trial on the merits, while to grant the second may have that effect. The real practical question on both applications is whether the Commission's order shall remain in force or be suspended. It is, of course, just as satisfactory to the plaintiff to enjoin it on appeal, with bond, as on the first application, with bond. The delay in enforcing the order, if it is finally enjoined, is likely to be greater by the granting of the stay on the second application than if it had been granted on the first. It seems to me utterly useless to have refused the first application, if the second is to be granted. If a case is now presented for the exercise of judicial discretion by revoking, in effect, our former order, we should have granted the interlocutory injunction on the first application. We gave reasons for the refusal of the injunction which seem to me equally controlling on the second motion. Conceding that the statutes allow a supersedeas after denial of the injunction in cases arising under section 266, we have before us practically the same question that we had on the first application—whether or not the Commission's order should be in force pending the litigation. The only difference is that the Commission's order is now fortified by the opinion of this court. Having refused to enjoin it and having put it in force on its merits after full hearing, it seems to me that it would be practically a reversal of our position to suspend it now after our elaborate approval of it. I do not lose sight of the fact that the first application was for an interlocutory injunction only, and that the second is also for appeal. The question of suspending the Commission's order is separate from the claim for appeal. The latter is granted as a matter of course. But as to the suspension of the Commission's order pending an appeal, if we have authority to grant it, the granting of it is a matter of judicial discretion. This application, like the one for the interlocutory injunction, is addressed to the judicial discretion.

It is argued that, because one of the judges dissented from the decision on the first application, such doubt is created that the second application should be granted. If one thing is made clear by the statute, it is that one judge cannot grant the injunction. If, when the injunction is refused by the court, composed of three judges, the dissent of one of the judges was permitted to control a second application, and cause an injunction or a continuance of the restraining order, the purpose of the statute would be defeated. One judge could still prevent the enforcement of the rates fixed by a Commission or by a Legislature.

It is urged that the second application should be granted because the decision of this court may be reversed. If a majority of the court now believe we have decided erroneously in refusing the injunction on the first application, the way to correct it here, if we have authority

to do so, is to set aside the order and grant the injunction. That should be done, if at all, directly, and not indirectly. The Supreme Court may, of course, reverse the decision. Many technical points are involved. But it is not likely that it will be held that the rates fixed by the Commission are confiscatory, in view of recent decisions of that court, some of them upholding even a 2 cents a mile rate on roads and facts not greatly different from those involved here. There is no danger of injustice to the plaintiff in letting the rates fixed stand till final hearing, for, on the evidence submitted, the rates fixed by the Commission are not confiscatory.

Stress is laid on the plaintiff's offer to give bond to indemnify passengers. The same tender was made on the application for an interlocutory injunction. Where the rights of a defendant may be protected by bond, the court will often exercise its discretion in favor of granting or continuing an injunction; bond being required of the plaintiff. This is often the case in controversies between individuals involving a sum of money or certain property, or even involving contracts, where the interest involved is certain and the defendant in the suit is the person to be indemnified. The bond in such cases protects the defendant. Here the defendants have no interest in the litigation. The suit is really against the people who travel or who may travel on the plaintiff's road. The Attorney General of the state receives notice under the statute, and appears, together with special counsel, for those really interested. The people who would travel at a lower rate, but who do not travel when the rate is unreasonable, are interested in enforcing the rate fixed by the Commission. No bond can be framed to protect them, for the individuals or numbers of individuals who would travel at the lower rate cannot be ascertained. The fact is, whatever the theory may be, that the bond in a case like this affords no adequate protection. The plaintiff, in argument, insists that at the 3 cents a mile rate it collects from passengers every day $400 more than it receives at the 2½-cent rate; that is, if it obtains the stay, and if there is a delay of 300 days in deciding the appeal, it will collect $120,000 that the Commission and this court have decided it ought not to collect. During the 300 days the plaintiff will hand each purchaser of a ticket a coupon representing the excess charge. The theory is that these coupons will be presented and redeemed if the lower rate is finally sustained. The fact is that such coupons are not, to any considerable extent, preserved and presented. Probably not one coupon in a hundred would ever be presented for payment. The plaintiff has nothing to lose and everything to gain by litigation and appeals prosecuted under such bonds. To allow an injunction under the circumstances is to needlessly encourage such suits and appeals and to prolong the litigation. The plaintiff has nothing to lose. If it fails in the final result, it will have the cash in hand to cover all possible claims, with probably a large surplus that would never be claimed.

The reasons which led to the passage of the statutes now forming section 266 of the Judicial Code are well known, and are part of the judicial and political history of the country, and no comment on them is necessary. The legislation was intended to check and prevent a

practice by which one judge, on ex parte hearings and affidavits, super-
seded acts of Legislatures and Commissions indefinitely, on the ground
that they were unconstitutional. The purpose of the section should
not be disregarded in construing it, or in the exercise of judicial dis-
cretion in deciding applications based on it. The purpose clearly is to
restrict the issuance of interlocutory injunctions in a designated class
of cases, and to prevent delays in the enforcement of certain statutes
or orders of Commissions. The section authorizes a single judge to
receive the application for an interlocutory injunction, but not to grant
it. He is required to call to his assistance two other judges "to hear
and determine the application." The two other judges are called for
no other purpose, and no other duty is imposed on them by the text
of the section. The judge to whom the application is made may, to
prevent irreparable loss or damage—and only for that purpose—grant
a temporary restraining order; but such order is to remain in force
"only until the hearing and determination of the application for an
interlocutory injunction." When the two judges who are called to the
assistance of the judge to whom the application is made sit with him,
and hear and determine the case, and make an order granting or deny-
ing the interlocutory injunction, they have discharged the duty placed
on them by the words of the statute. They have done what they were
called to do, and what the statute authorizes them to be called for;
that is, to the assistance of the judge to whom the application was
made—"to his assistance to hear and determine the application" for
an injunction. The section provides that an appeal may be taken to
the Supreme Court from the order granting or refusing the injunction,
but there is nothing in the section to indicate that the District Judge
alone could not grant the appeal. If he alone granted the appeal, it
would, of course, be without an accompanying order suspending the
operation of the disputed rates, for it cannot be held that it was in-
tended that the one judge could defeat the order of the three judges
by granting a stay on appeal which had just been refused by the three
judges on the application for injunction. But the contention of the
plaintiff is that the three judges, or a majority of them, may, after
refusing the interlocutory injunction, grant an appeal and continue the
restraining order against the rate in question until the appeal is de-
cided. The very question which the section brings the three judges
together to hear is whether or not an interlocutory injunction shall be
granted. If it is granted, there is no longer any need for the restrain-
ing order to prevent the rates going into effect, for the interlocutory
injunction would take the place of the restraining order; if it is re-
fused, the restraining order should end, because the statute so pro-
vides, and because the refusal is a decision that there should be no
injunction and that the rates opposed should go into effect.

The provision requiring five days' notice to the Governor and Attor-
ney General and to the defendants, the provision peremptorily limit-
ing the operation of the temporary restraining order, and the provi-
sion that the federal courts will surrender jurisdiction upon certain
conditions of litigation in the state courts (Judicial Code, § 266), all
point to a reluctance on the part of Congress to have state action en-

joined by federal power, and to the intention that, if the court composed of three judges refuse the interlocutory injunction, the contested rates shall be enforced.

But if it be conceded that the statute or the general law gives us a discretionary power to set aside the Commission's rate now in force and to reinstate the rates fixed by the railroad company—a question not necessary to decide now—I do not think a case is presented for the exercise of such discretionary power. The application to continue the restraining order should be refused, because we have already decided that the rate fixed by the Commission should not be enjoined. I reach this conclusion from reasons given in this opinion and from the reasons given in other opinions filed in this case on the application for an interlocutory injunction.