### ARKANSAS–LOUISIANA GAS CO. v. CITY OF TEXARKANA, ARK., et al.

#### No. 219.

District Court, W. D. Arkansas, Texarkana Division.

Oct. 31, 1936.

H. C. Walker, Jr., of Shreveport, La., W. H. Arnold, Jr., and Arnold & Arnold, both of Texarkana, Ark., and W. C. Fitzhugh, of Shreveport, La., for plaintiff.

Willis B. Smith and Ben E. Carter, both of Texarkana, Ark., for defendants.

RAGON, District Judge.

On October 23, 1933, the original plaintiff, Southern Cities Distributing Company, filed an application with the city council of Texarkana, Ark., for an increase in rates on gas furnished to the residents of the city. The rate under which gas was being furnished was fixed by the city council in 1923, and provided for a rate of 50 cents per thousand cubic feet on the first 100,000 cubic feet, or fraction thereof, sold in any thirty-day period to domestic or commercial consumers. A rate of 22 cents per thousand cubic feet was provided on gas sold in an amount over 100,000 cubic feet. The industrial rate provided for a charge of 21 cents per thousand cubic feet on the first 500,000 cubic feet, and a reduction of one cent on each successive million in excess of 500,000, until the rate was reduced to seventeen cents. The rate schedule provided further that bills for monthly consumption should be subject to a discount of 10 per cent. from the above rates if the bill be paid within ten days after rendition.

In 1930, the gas company applied for an increase in rates, and after hearings were held the gas company and the city council agreed upon the following rates to domestic and commercial consumers.

First 1,000 cubic feet, $1.00.
Next 149,000 cubic feet, $.50.
Excess of 150,000 cubic feet, $.25.

All gas sold for the 50-cent rate was subject to a 5 per cent. discount if paid within ten days after the bill was rendered, and that sold on the 25-cent rate was likewise subject to a discount of 2 cents per MCF. The industrial rates were the same for all practical purposes in this opinion as the 1923 schedule. A charge of $1 was provided for each connect and disconnect on domestic and commercial customers after first installation was made for the same customer, except where meter was to be removed for company purposes. The resolution providing these rates was submitted to a vote of the people on a petition for a referendum and the resolution was defeated. The gas company attempted to enjoin the enforcement of the 1923 rates, but their action was eventually dismissed by the Circuit Court of Appeals.

On October 23, 1933, the gas company applied again for an increase of rates and provided for the following schedule:

First 1,000 cubic feet, $1.75.
Next 2,000 cubic feet, $.75.
Next 7,000 cubic feet, $.55.
Over 10,000 cubic feet, $.35.

A minimum charge of $1.75 for each thirty-day period should be made to each domestic and commercial consumer connected to the distributing system. An additional 10 per cent. charge over the above rates was to be made to each consumer who failed to pay his bill within ten days after it was rendered. Industrial gas was to be served under a special contract, mutually agreed upon between the company and customer, and a minimum charge of $25 per month was to be charged to those customers to whom the industrial rates applied.

The city council, after hearings had been held, declined to grant the gas company's rate and on December 22, 1933, passed a resolution ordering the gas company to proceed under the following rates:

First 100,000 cubic feet, $.50.
Over 100,000 cubic feet, $.22.

A 10 per cent. discount applying on monthly accounts for service rendered at any individual installation where services rendered are paid at the company's office on or before ten days following the date of bill. It provided practically the same rates for industrial gas as the 1923 schedule. The council further reserved the right to consider reductions at subsequent hearings.

On February 12, 1934, the council made another order further reducing the rates to 45 cents on the first 100,000 cubic feet, and providing for a discount of 5 cents per MCF on bills carrying the 45-cent rate. This resolution concluded as follows: "Except as herein modified, the order embodied in the Resolution of December 22, 1933, shall remain in full force and effect." I have enumerated only the rates in the different applications of the company and council resolutions which I have deemed pertinent to the issues involved, and the short resolution of February 13, 1934, had only the effect of amending the resolution of December 22, 1933, on the first 100,000 cubic feet of gas furnished.

The plaintiff then filed its bill, asking that the city council be enjoined from enforcing the rates embodied in the resolutions of December 22, 1933, and February 13, 1934, and enjoined from interfering with the plaintiff in charging the schedule of rates set forth in their application of October 22, 1933. A temporary injunction was granted on February 16th in the terms of plaintiff's bill.

All of the stock, excepting qualifying directors' shares, in the original plaintiff corporation, Southern Cities Distributing Company, the Arkansas-Louisiana Pipe Line Company, and the Reserve Natural Gas Company, was, at the time of the institution of this litigation, owned by the Arkansas Natural Gas Corporation, which was in turn controlled and dominated by the H. L. Doherty interests in the city of New York. During November, 1934, the first three named corporations were merged under the name of Arkansas-Louisiana Gas Company; the new company was substituted as plaintiff. The original plaintiff corporation bought the gas which it distributed to its customers in the city of Texarkana from its affiliates, the Arkansas-Louisiana Pipe Line Company and the Reserve Natural Gas Company, which were operated as a unit, paying for the gas it distributed to its domestic consumers thirty-nine cents per MCF, making special contracts with its industrial consumers, paying the operating companies three cents less per MCF than it received from industrial customers. The Arkansas Natural Gas Corporation was also fiscal agent for its subsidiaries, receiving and disbursing all, or at least the major portion, of all funds of all companies.

Before going to the issues, a brief discussion of the statutes of Arkansas, authorizing the city council to fix rates, will not be amiss, since there is some diversity of opinion as to the weight which should be given to the council's action. In 1921 the Arkansas Legislature passed Act No. 124, p. 177, which gave exclusive jurisdiction to the city council of municipalities to fix, or modify, gas rates within the municipalities. This act provides the procedure to be followed in rate legislation by the city council. It provided for initiation of rate schedules by either the gas company, or the council, and that a hearing should be held and upon these hearings a rate should be determined. It required the utility to furnish, upon order of the council, all reports, rates, classifications, rules, or other practices in force at any time and to furnish for the purpose of examination and investigation all books, records, and other information as to any matter pertaining to its business or organization. It also requires the utility to furnish from time to time verified itemized and detailed inventories and valuations of any or all its property. The act sets out a full and complete procedure for the council to follow in establishing or modifying rate schedules.

On March 3, 1933, a statute became effective (Acts 1933, p. 203, No. 72) providing for the creation of a fact-finding tribunal for a period of four years. Section 2 of the act gave to the tribunal the power to investigate and make a finding of all facts entering into or forming the basis of rates charged by any public utility, whether operating under a franchise or indeterminate permit. Such investigation and finding of facts are to be made at the instance of any city council, utility company, or of the corporation commission. Section 5 of the act stated the purposes for which the tribunal was created and reciting that the cities and towns were financially unable to ascertain and develop facts upon which rates might be determined. Act No. 174, p. 471, of the Acts of 1935, declares the meaning of Act No. 72 of the Acts of 1933 by making the findings of the tribunal the sole record upon which the council or courts could act in fixing a rate.

Under the Act of 1921, the city council was made a rate-regulating body by the State Legislature. The fact-finding tribunal was created for the purpose of assisting the city council, if the council or the utility called upon them. Its creation neither took away nor added to the authority of the city council, except to lend itself as an

agency in developing facts when called upon to do so. Although the fact-finding tribunal was in existence, neither party to this action called upon it to assist in finding the facts upon which rates might be determined. The hearings before the city council proceeded over a period of several days, both sides being represented by able counsel, and several hundred pages of testimony was produced and among the witnesses before the council appeared for both sides some of the ablest experts in the country. The council, through a questionnaire, procured various data as to the company's affairs. I find from arguments of counsel that the principal witnesses before the master were also the principal witnesses before the council.

After giving several weeks' consideration to the plaintiff's application, the city council passed a resolution embodying a finding of facts which have been made a part of the record. These findings of facts in their thoroughness of detail and orderliness of conclusions disclose a consideration in rate structures not usually found in the deliberations of city councils. These findings, in the very nature of such cases, have an evidential value in determining whether or not the city council, as triers of fact, acted unreasonably and arbitrarily. Of course, in fixing the standard of their evidential value, consideration must be given to their experience or lack of experience as triers of fact in such cases. Under these circumstances, I can but give to the findings of fact embodied in the resolution by the city council upon which they determined the gas rate in question, a consideration of the same force and effect as if made by the fact-finding tribunal, or any other rate fixing commission set up by a state. This does not mean that they are accepted by the court as the sole record upon which the court will act in determining the issues in this case, but they may be accepted as a factor in determining the question of confiscation.

It seems to me that the master, encouraged by counsel for plaintiff, and in some instances by counsel for defendant, in dealing with the issues of this case, has fallen into the tempting error of permitting his deliberations to follow a legislative, rather than a judicial trend, in reaching his conclusions. Since the conclusion of the final arguments, both parties have filed briefs presenting opposing views as to the duties of the court in reviewing the rates fixed by an authorized commission and the master has likewise filed a supplement report, largely argumentative, on the same point. I do not find in the authorities on this point such a variance as would justify any confusion. In fact, the zones in which the legislative and judicial bodies are free to exercise their respective jurisdictions have time and again been clearly defined by the Supreme Court of the United States and inferior federal courts.

The master found (section 44): "So that it will be seen that while it is absolutely necessary to determine the cost of gas delivered at the city gates, the purpose is not to dictate the price at which the pipe line company shall sell its gas, but it is done for the sole purpose of ascertaining what the distributing company shall be permitted to charge into its expense account for gas purchases, and, further, while it may be necessary to find what rates the distributing company should have fixed to avoid confiscation, this finding is for the purpose of comparison of the rates fixed by the city, in order to ascertain whether the latter are confiscatory. When this general finding on the issue of confiscation is made, the power and duty of the Court ceases."

The master, in this declaration, apparently set up a schedule of what he considered reasonable rates to be charged by the distributing company in selling its gas, and then invoked a comparison between the results and the city rates to be determined whether or not the latter were confiscatory. Section 44, Master's Report. This is exactly what the courts caution us not to do. This method means the substitution of the court's judgment for that of the rate-making body. The court is not to set up a reasonable rate, but is to pass upon whether the rate ordained by the city council is so unreasonably low as to amount to confiscation. It may be said this is a distinction without a difference, but I do not so regard it, because a "reasonable rate" is a variable term depending upon many different factors. A rate of return on valuation may be reasonable in one instance and unreasonable in another, or differences in purchasing power and other economic conditions, subject to change, are illustrations of the variableness of the term. So the courts are unanimous in holding that it is within the province alone of the legislative body to say what shall constitute a reasonable rate and strongly caution against an invasion of this province by the court.

A rate, from a legislative standpoint, may be unreasonably low, and yet be a reasonable rate from a judicial viewpoint. The authorities seem to recognize a marked distinction between a rate which is not confiscatory in its character and a rate which is fair from an economical and commercial sense. Under these authorities a rate of return may be all-sufficient to meet the demands of the Fourteenth Amendment of the Constitution of the United States and at the same time fail to encourage and justify the operation of a utility business with that degree of service to which the public is entitled. The first is a judicial question, while the second is essentially legislative. Banton v. Belt Line Ry. Corporation, 268 U.S. 413–422, 45 S.Ct. 534, 69 L.Ed. 1020; Idaho Power Co. v. Thompson (D.C.) 19 F.(2d) 547; Monroe Gaslight & Fuel Co. v. Michigan Pub. Utilities Comm. (D.C.) 292 .F. 139; Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150; Keller v. Potomac Electric Power Co., 261 U. S. 428, 43 S.Ct. 445, 67 L.Ed. 731; Reagan v. Farmers Loan & Trust Co., 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014; Columbus Gas & Fuel Co. v. Public Utilities Commission, 127 Ohio St. 109, 187 N.E. 7.

In the Dayton Power & Light Company v. Public Utilities Commission of Ohio, 292 U.S. 290, 54 S.Ct. 647, 656, 78 L.Ed. 1267, the court said: "The omission to make it .does not appear to have been so unreasonable or arbitrary as to overleap discretion and reach the zone of confiscation. 'It is necessary again, in this relation, to distinguish between the legislative and judicial functions.' * * * Much that the framers of a schedule are at liberty to do, this court in the exercise of its supervisory jurisdiction may not require them to do."

In Banton v. Belt Line Railway Corporation, Justice Butler said: "A commission or other legislative body, in its discretion, may determine to be reasonable and just a rate that is·substantially higher than one merely sufficient to justify a judicial finding in a confiscation case that it is high enough to yield a just and reasonable return on the value of the property used to perform the service covered by the rate. The mere fact that a rate is nonconfiscatory does not indicate that it must be deemed to be just and reasonable. It is well known that rates substantially higher than the line between validity and unconstitutionality properly may be deemed to be just and reasonable, and not excessive or extortionate."

So I may conclude that a reasonable rate for the purpose of this case carries a double meaning, one a legislative and the other a judicial, and the latter is the only one to give concern in this instance. The sphere in which a court may proceed is much more limited than that in which the Legislature may act, and, therefore, to fix merely. a nonconfiscatory rate by a comparison with a reasonable. rate as fixed by a legislative body is illogical.

It is the function of the state of Arkansas, acting through its properly delegated agent, the city council, to say what gas rates should obtain in Texarkana, Ark. These rates may be fixed too high or too low, and it is still a legislative function not subject to molestation unless they are fixed so unreasonably low as to result in the taking of private property for a public use· without just compensation. In such case, resort may then be had to the court, which, acting upon its own independent judgment of the law and the facts, determines whether the rate making body unreasonably fixed the rates so low as to amount to confiscation. The courts have not given a too clearly defined meaning of "due process," but adding to the more or less abstractions in the foregoing statements, a rate which is so low as not to enable the company to pay legitimate expenses and realize a fair return on the reasonable value of its property, is a rate which is confiscatory. As stated before, the court has no power to substitute its own judgment of what is reasonable in place of the city council, and it will only invalidate the ordinance of the council when it is convincingly shown to be confiscatory. The rule is fairly stated in case of Willcox v. Consolidated Gas Company, 212 U.S. 19, 29 S.Ct. 192, 195, 53 L.Ed. 382, 48 L.R.A.(N. S.) 1134, 15 Ann.Cas. 1034: "The question arising is as to the validity of the acts . limiting the rates for gas to the prices therein stated. The rule by which to determine the question is pretty well established in this court. The rates must be plainly unreasonable to the extent that their enforcement would be equivalent to the taking of property for public use without such compensation as, under the circumstances is just both to the owner and the public." ,

Again it was said in the case of San Diego Land & Town Company v. National City, 174 U.S. 739, 19 S.Ct. 804, 810, 43 L.Ed. 1154:

"It is equally clear that this power could not be exercised arbitrarily, and without reference to what was just and reasonable as between the public and those who appropriated water and supplied it for general use; for the state cannot by any of its agencies, legislative, executive, or judicial, withhold from the owners of private property just compensation for its use. That would be a deprivation of property without due process of law. * * * But it should also be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction, unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation, as, under all the circumstances, is just, both to the owner and to the public. * * *

"In view of these principles, can it be said that the rates in question are so unreasonable as to call for judicial interference in behalf of the appellant? Such a question is always an embarrassing one to a judicial tribunal, because it is primarily for the determination of the legislature or of some public agency designated by it. But when it is alleged that a state enactment invades or destroys rights secured by the constitution of the United States, a judicial question arises, and the courts, federal and state, must meet the issue, taking care always not to intrench upon the authority belonging to a different department, nor to disregard a statute, unless it be unmistakably repugnant to the fundamental law."

Minnesota Rate Cases, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.(N.S.) 1151, Ann.Cas.1916A, 18; Georgia Railway & Power Co. v. Railroad Commission, 262 U.S. 625, 43 S.Ct. 680, 67 L.Ed. 1144; Railroad Commission v. Cumberland T. & T. Company, 212 U.S. 414, 29 S.Ct. 357, 53 L.Ed. 577; Cedar Rapids Gas Light Company v. Cedar Rapids, 223 U.S. 655, 32 S. Ct. 389, 56 L.Ed. 594; People ex rel. New York & Queens Gas Company v. McCall, 245 U.S. 345, 38 S.Ct. 122, 62 L.Ed. 337; Dayton Power & Light Co. v. Public Utilities Commission, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267.

■ The issue then is, not what rate the distributing company should charge nor what rate the city council should fix, nor still a rate which, in the opinion of the court, might be reasonable, but was the rate fixed by the state of Arkansas, acting through the city council of Texarkana, Ark., so low as to be in effect confiscatory; and this issue is to be determined by the court upon its own independent judgment of the law and the facts. Ohio Valley Water Co. v. Bell Avon Borough, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908; Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598; Bluefield Water Case, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176; Denver Union Stock Yard Co. v. United States (D.C.) 57 F.(2d) 735. As aptly stated by the masters in considering the facts, the courts are bound by all applicable rules of evidence, including those requiring the quantum of proof necessary to establish confiscation.

■ With the issue defined, the next question logically presenting itself has to do with the weight that should be given by the court to the rate resolution in issue. The authorities are without dissent in declaring that the rates carry a presumption that they are not confiscatory. The rates, according to the authorities, must be regarded as prima facie just, fair, and valid. On this point I find a clear statement of what I conceive to be the rule, announced by a three judge-court in Louisville & N. R. R. Co. v. Railroad Commission (D.C.) 208 F. 35, 41:

"In deciding the question whether or not an order made by authority of the state, fixing rates, is confiscatory, the inferior courts, as to the measure of proof, are guided by well-settled rules, binding on them because announced by the Supreme Court. One of those rules is that the rate fixed by legislative authority is prima facie fair and just. The rate having been fixed by a commission vested with legal authority, the presumption must be indulged at the outset that it is reasonable and not violative of constitutional rights. The burden of proof is placed on the plaintiff to show that the case is one calling for judicial interference with the authorized action of the local authorities. Louisiana R. R. Commission v. Cumberland Tel. Co., 212 U.S. 414, 29 S.Ct. 357, 53 L.Ed. 577; Minneapolis & St. Louis R. R. Co. v. Minnesota, 186 U. S. 257, 264, 22 S.Ct. 900, 46 L.Ed. 1151. Another rule for our guidance is that the burden of proof is not only placed on the plaintiff, but that the plaintiff is required to do more than offer a mere preponderance of evidence. The judiciary is not permitted to interfere with the rates established by legislative authority unless it is made to appear clearly and beyond reasonable

doubt that they are unreasonable and that their enforcement would be equivalent to the taking of property for public use without just compensation. If the evidence offered leaves the court in doubt, if it is not clear, satisfactory, and convincing, the rate fixed by state authority should not be enjoined. San Diego Land Company v. National City, 174 U.S. 739, 754, 19 S.Ct. 804, 43 L.Ed. 1154; St. Louis & San Francisco Ry. Co. v. Gill, 156 U.S. 649, 666, 667, 15 S. Ct. 484, 39 L.Ed. 567. So stringent are these rules against the interference with the action of the local authorities in fixing rates that it has been said that the court should not enjoin a rate unless it can hold 'that it was impossible for a fair-minded board to come to the result which was reached.' Knoxville v. Water Company, 212 U.S. 1, 17, 29 S.Ct. 148, 153, 53 L.Ed. 371."

Louisiana R. R. Commission v. Cumberland Tel. Co., 212 U.S. 414, 29 S.Ct. 357, 53 L.Ed. 577; Minneapolis & St. L. R. R. Co. v. Minnesota, 186 U.S. 257, 22 S.Ct. 900, 46 L.Ed. 1151.

The plaintiff, however, insists that if a presumption should be thus indulged as to the ordinance of the city council, it should be a slight presumption. At various places in their written arguments and at numerous times in their oral arguments, counsel for plaintiff has taken occasion to call the court's attention to the nonexpert character of the personnel of the council, apparently expecting the court would take notice of this fact and give it consideration. The court might very well take judicial notice that the people do not ordinarily elect rate experts to the position of city alderman. The council usually represents a fair cross-section of the professional, business, and laboring men of the community. In this case, they sat as triers of facts, and before them some of the most skilled accountants and rate experts in the country appeared. According to the record, a consideration of rates for the city spread over weeks, and while comment has already been made upon their experience as rate makers, yet their experience outside the zone of their official position might amply qualify them as triers of facts adduced from the testimony of experts, particularly with reference to the important factors of valuations, return, and depreciation.

The city council in promulgating the rates in issue was exercising a function delegated to it by the highest legislative authority in the state, and its fact finding resolution and rate ordinance are both in the record and speak for themselves in reflecting the extent and thoroughness of the study and investigation made and the results thereof.

■ The master discusses the burden of proof, and his holdings on this question coincides with the views of the court.

"To establish confiscation considerably more than a preponderance of the evidence is required. The quantum necessary is variously described in the decisions of the Supreme Court as 'clear and satisfactory,' 'clear and convincing,' 'With the clarity and definiteness befitting the cause.' Confiscation must be 'clearly established,' 'the power ought to be exercised only in the clearest cases.' 'It must be of such commanding quality as to apply coercion tó the mind of the court and exclude every choice but one.' 'Beyond all doubt, etc.' "

To quote some of the authorities:

"Upon the whole, we do not feel warranted, by all that appears in this record, in declaring invalid an act of the legislature of Arkansas which on its face appears to be a legitimate exercise of power, and which has not been shown by clear and satisfactory evidence to operate unjustly and unreasonably, in a constitutional sense, against the plaintiff in error." St. Louis & S. F. Ry. Co. v. Gill, 156 U.S. 649, 15 S.Ct. 484, 491, 39 L.Ed. 567, 573; United Fuel Gas Co. v. Railroad Commission, 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390, 398; Los Angeles G. & E. Corporation v. Railroad Commission, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180, 1181, 1194.

"Indeed, the truth becomes obvious when one reads the testimony as a whole that the prices upon sales were playing a subordinate role, and that the ultimate appraisal was a forecast of productive power. Granting even that the testimony had an evidential value, it had that and nothing more. It had no such commanding quality as to apply coercion to the judgment of the appointed triers of the facts, and exclude every choice but one." Dayton P. & L. Co. v. Public Utilities Commission, 292 U. S. 290, 54 S.Ct. 647, 653, 78 L.Ed. 1267.

"The burden of proof is upon the party adverse to the commission to show by clear and satisfactory evidence that the determination, requirement, direction, or order of the commission complained of is inadequate, unreasonable, or unlawful as the

case may be." Keller v. Potomac Electric Power Co., 261 U.S. 428, 43 S.Ct. 445, 447, 67 L.Ed. 731.

In San Diego Land Company v. National City, 174 U.S. 739, 19 S.Ct. 804, 810, 43 L.Ed. 1154, the court held the case should be made out clearly and beyond all doubt in order to compel the court to conclude that the rate was confiscatory: "Unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property, under the guise of regulations, as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use."

In Knoxville v. Knoxville Water Company, 212 U.S. 1, 29 S.Ct. 148, 53 L.Ed. 371, it was said by the court that a rate should not be enjoined unless the court can hold that it was impossible for a fair-minded board to come to the result that was reached. These rules are not mere cautionary phrases, but are intended to mark the limits of judicial interference. Louisville & N. Railroad Company v. Railroad Commission (D.C.) 208 F. 35.

Thus, it will be seen that an extremely heavy burden rests upon the gas company to show the rates ordained by the city council were confiscatory. This heavy burden not only goes to the whole case, but it applies also to each disputed point involved.

One great difficulty in this case is the absence of any historical evidence, and the cost of acquisition on the books of the present company can hardly be relied upon in every particular as a proper basis for finding present fair value. The master in establishing a rate base has considered the value of plaintiff's property as determined by the costs of reproduction new at the time of inquiry, less accrued depreciation. To establish this, reliance must be had upon opinions given by expert engineers, and accountants, and necessarily this is not always satisfactory. While not satisfactory, cases of this kind in the very nature of the issues require a considerable volume of opinion evidence and the results depend upon the weight accredited to such testimony.

In analyzing the rate base found by the master, I shall follow the items as he has them listed in his report for the convenience of all concerned, since they are based on a very orderly arrangement of requests filed by the plaintiff and counsel for both sides have grown accustomed to this order of study.

The master first ascertained the valuations of the production property and the transmission property. He found a rate base of the production and transmission properties, calculated upon a reproduction cost new of $31,879,350, and a present value of $28,217,684, representing a 10 per cent. reduction from the reproduction cost new for accrued depreciation. The plaintiff had contended for a valuation based on reproduction cost new of $37,677,547 and a present value of $35,041,826. The company listed the value of this property on their books at $33,659,162, but insist that this is not a correct valuation for the present purpose. The city council made a finding as to the rate base on these properties, amounting to $27,334,274.28. This, it will be seen, constitutes a negligible difference between the findings of the master and the city council, amounting, in fact, to only $883,409.72. The master allowed one item of going concern value of $1,825,000 which was not allowed by the city council as a separate item. If this amount be deducted from the total valuation found by the master, the council's valuation exceeds that of the master by $941,590.28.

### Going Concern Value.

A going concern value is generally recognized by the authorities as a proper allowance in a rate base, but the proof of the same is subject to the same general rules of evidence as any other item. While its presence is recognized, its value must be proven and the heavy burden of so doing is upon the plaintiff. In attempting to allow for a going concern value as a separate item, it is found to be elusive because of confusing it with items already charged. Rate-making commissions sometimes consider the "bare-bones" value of the property and add a going concern value as a separate item, and sometimes charge it in with other items of cost and expenses and make no separate allowance.

In the Dayton Case, 292 U.S. 290, 308, 54 S.Ct. 647, 656, 78 L.Ed. 1267, the court said: "The Commission was of opinion that there was here no constituent of property that called for separate appraisal apart from the recognition that had been given it as a contributory factor in other elements of value."

The city council found that the larger part of the property of the plaintiff

was not of the character for which a going value could be allowed because the greater portion of the transmission plant had been constructed after contracts for gas delivery had been made and that other elements of going concern contended for by the company had been allowed by the city council in other items of cost and expense. Was the omission of the city council, in allowing a going concern value, an act so unreasonable and arbitrary as to overleap discretion and reach the zone of confiscation as held in the Dayton Case? The master, it seems to me, answers this question in sections 107 to 112, inclusive, in his report.

"107. I arrive at the following conclusions as to the principles there announced. (1) Where, by reason of the principal portion of the sales being made to affiliates and the success of the enterprise is therefore 'instant and continuous,' the utility is not entitled to add hypothetical costs of attaching business to its going value. (2) That theoretical estimates of the cost of attaching new customers is condemned. (3) That, as far as such expenses had been actually incurred by an affiliated company (the only parts of the system that would incur these expenses, except, perhaps, industrial contracts outside of municipalities secured directly by the pipe line company), they have presumptively already been included in the costs of operation and returned through former rates. (4) That the burden of building up patronage is negligible where there is little competition with any other producer or with other kinds of fuel. (5) That the rejection of opinions derived from a professed experience and understanding of business conditions generally and based to a very small extent on the 'history and circumstances of the particular enterprise' is not beyond the discretion of the court."

First proposition, supra:

"108. Here, at least as to the 60' of plaintiff's properties constructed in 1928, the testimony shows that it was constructed for the express purpose of supplying business already secured and attached (See excerpt from Hamilton's testimony, supra) and hence its success was 'instant and continuous.' As to the other 40% we have no history."

Second proposition, supra:

"109. Here the entire calculations as to cost of attaching new customers is hypothetical, and, being so, is condemned by the above authority."

Third proposition, supra:

"110. Outside of the securing of a few major contracts for industrial consumers outside of cities and town, all expenses for securing customers and developing business has been incurred by the distributing units, and have presumably been long since charged into operating expenses and recouped under past rates."

Fourth proposition, supra:

"111. Plaintiff has a monopoly in the field served by it. The consumer that desires to use gas can go nowhere else for it. While it is true that it is in competition with other fuels, especially cheap fuels that might be used by industries, yet the convenience and cheapness of the commodity speak for themselves and no particular campaign is necessary to promote the use of gas. Customers usually decide these matters for themselves without solicitation or propaganda."

Fifth proposition, supra:

"112. Here the 'Build-up' by engineers for both parties is based on a 'professed experience and understanding of business conditions generally,' coupled, as said by plaintiff's witnesses, with a study of plants similarly situated. The entire rejection of all these estimates would not be error under the above authority."

The master then concludes, in section 114 of his report, as follows: "From the above discussion this item might be altogether rejected as not having been sufficiently proven."

I have heard the arguments of counsel on this point, read the testimony, and studied the exhibits, and am left sharing the doubts manifested by the master. If the plaintiff fails to establish this item by convincing evidence, the item should not be considered.

The master made the allowance on the testimony of engineers for the city. However, I have searched briefs and testimony in vain for an intimation that the engineers, in their testimony fixing the amount allowed by the master, took into consideration, in their calculations of the constituents of this amount, the fact the plant had a 60 per cent. hook-up of customers instant and continuous.

Plainly, it occurs to me, the finding of the city council as to the rate base for the production and transmission property was reasonable and should be sustained. In order to follow the clear and distinct outline

set up by the master in the rate-base table set out on pages 85 and 86 of his report, I am reducing his allowance for going concern value to $941,590.28. This will bring his findings to the amount which the city found. In allowing this item, the court is not motivated so much by a desire to allow a going concern value under the testimony, as he is to retain orderly procedure set up by the master and effect a balance between his findings and those of the council. It may be contended that the effect of this arrangement would be to add $941,590.28 to the city's findings, but such are not the intentions of the court, since this is an independent investigation. I am sustaining the master in all other respects in his findings on the rate base. The rate base, therefore, of the production and transmission properties will be $27,334,274.28.

 The company asked a rate base on the distributing plant's property of $381,229.52, present value, and the master allowed $338,473.15. The city council allowed a rate base on this property of $321,725.00, or a difference of $16,000 between the allowance of the master and the city. This difference is affected again by the allowance of $33,000 going concern value by the master which was refused by the council on the ground that no separate allowance could be made for this item since it has been considered in the valuations of other items. The master made an allowance of $4,910 for legal and administrative expenses when the company only asked for $3,060.65, on the theory that the city's testimony showed this amount. It seems to me the company's figures on this item should have been accepted because in a business enterprise no larger than this distributing plant, the company would be in a better position to know what these expenses should be than any one else. Accordingly, for the reasons heretofore set forth in considering the rate base for the production and transmission properties, the going concern value of the distributing property will be reduced after the reduction is made in the item of legal and administrative expense, to such amount as will balance with the $321,725 rate base found by the city council.

## Expenses.

 The master, in arriving at the proper allowance for expenses, has used a four-year average based upon the plaintiff's actual expense for the years of 1930 to 1933, both inclusive. In view of the great variance in the expenses and earnings, due to the influence of the depression, I think it is proper to use the average expenses as the master did.

The master found that the plaintiff's average annual expenses for the four years, exclusive of cost of gas purchased, depreciation, depletion, amortization of the cost of producing leases, and the amortization of costs incident to the development of leases, abandoned leases, drilling dry holes, geological scouting, etc., were: Operation, maintenance, severance taxes, and royalties, $110,597.10; general expenses, $167,916.29; taxes, $355,430.97; transmission lines expense, $420,488.84; compressor station expense, $193,050.75. With the exception of the item of general expense, both parties agree that the foregoing items are proper allowances.

## General Expense.

 Included by the master in general expense of $167,916.29 are two items aggregating $33,926.46, to the allowance of which by the master the city excepted. One of the items amounts to $2,593.79, referred to as "Employees' Subscription Plan Bonus." The record is so indefinite with respect to the use and benefit of this item, it should not, in my opinion, be treated as an item of operating expense.

The other item amounting to $31,332.67 is referred to as "New York Administrative Expense." This is an amount paid by the plaintiff to H. L. Doherty & Co. and might be classed as a management fee. H. L. Doherty & Co. is an affiliate of the plaintiff. Concerning this item the master states: "There is testimony in the record that all these affiliated companies have contracts with H. L. Doherty & Company of New York to furnish engineering and other advice and supervision from its experts whenever required, for which service certain percentages of return are paid. No particular effort is made to show that the prices charged for this service are exorbitant, or that plaintiff does not receive value for this payment."

 Again, the master falls into the error of reversing the order as to the burden of proof when he states "no particular effort is made to show that the prices charged for this service are exorbitant, or that plaintiff does not receive value for this payment." The burden rested heavily upon the plaintiff to show that this was a service of value to the company and not in the na-

460

ture of extra or additional dividends arising out of the relation of H. L. Doherty & Co. to the affiliated companies. The pipe line companies were controlled by the Arkansas Natural Gas Corporation, the common stock of which was controlled by the City Service Company, a Doherty organization. Aside from the terms of the contract, I am unable to find in the voluminous record any substantial testimony as to the cost of this engineering service, or of the value of·it to the company. While this service has been recognized by the authorities as a proper allowance for operating expenses, yet there must be substantial evidence that the service called for in such contracts have a value to the company commensurate with the price paid and that such price is fair and does not exceed the actual cost of rendering the service. Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 51 S.Ct. 65, 75 L. Ed. 255; Western Distributing Co. v. Public Service Comm., 285 U.S. 119, 52 S.Ct. 283, 76 L.Ed. 655; Wichita Gas Co. v. Public Service Comm. (D.C.) 2 F.Supp. 792.

The plaintiff made no effort to justify this expense, other than to contend in argument that the plaintiff was not an affiliate of H. L. Doherty & Co. This contention was exclusively based upon the fact that when, and so long as, plaintiff was in default in the payment of dividends upon preferred stock, such stock was in voting control of plaintiff. The proof was that there was such a default and that the owners of the preferred stock had exercised their rights and elected the plaintiff's board of directors, and that such preferred stockholders were not affiliated with H. L. Doherty & Co. The directors elected by the preferred stockholders were the same as those elected by the holders of the common stock prior to default, with one or two exceptions. The assertion of control by the preferred stockholders did not in the least change the management of the company. In order to shift or even lessen the burden resting heavily upon plaintiff with respect to dealings between affiliates, there must be a more substantial change than took place in this relationship.

Therefore, I find that the item of general expense as fixed by the master at the sum of $167,916.29 should be adjusted by eliminating therefrom the sum of $33,926.46, the aggregate of the items representing "Employees' Subscription Plan Bonus" and "New York Administrative Expense." The

general expenses, as adjusted, are allowed in the sum of $133,989.83.

Cost of Gas Purchased.

The plaintiff purchases approximately two-thirds of the gas handled by it. It has two contracts which are referred to in the record as the "Dixie Gulf" and "Palmer" contracts. There is considerable controversy between the parties as to whether the gas purchased and delivered under the contracts, as well as the cost thereof, should be eliminated from consideration in this case.

I am of the opinion that the master's original finding on the Dixie Gulf contract should be sustained. He found that the gas, as well as the cost thereof, should be considered and treated as a part of the system's gas and costs. The master submitted supplemental findings on this contract, but I cannot arrive at any other conclusion than that his findings in his original report should be adopted.

His findings with respect to the Palmer contract should also be adopted. The master found that the gas, as well as its cost, purchased and handled under this contract should not enter into the calculations in this case.

There is one item arising out of the Palmer contract which was not presented to the master, but which was discussed before the court, and that is the profit accruing to the plaintiff out of a sale of a portion of the gas purchased. As I understand it, the fact that such profit should be properly incorporated in the calculations, is not controverted by the plaintiff. This profit of $103,883.01 should be applied as a credit to the commodity cost hereinafter discussed and fixed.

Depletion and Depreciation Allowances.

In all cases of this character it is necessary that the plaintiff be allowed to burden operations with a charge sufficient to cover depletion and depreciation. The former is necessary in order to reimburse the utility for wasting assets and the latter is to cover the wear and tear incident to the use of physical property. In connection with wear and tear, consideration must also be given to obsolescence and inadequacy.

Depletion and depreciation allowances are the most important items to be considered, as well as the most difficult to determine. After a study of the testimony in

this case, I am convinced that the property must be considered, for the purposes of depletion and depreciation, under four classifications: (1) General property; (2) production property; (3) transmission property; and (4) distribution property. The allowances for the respective properties will be discussed in the order stated.

1. For the purposes of depreciation the master grouped the general property with the transmission property. While it makes but little difference in the final outcome, yet I think after reading the testimony of the plaintiff's witness Lyon, that the general property is susceptible of a distinct classification for depreciation purposes, because it is characterized by a comparatively short service life and a high rate of depreciation. The master fixed the value of the general property at $59,341, of which $22,889 represents the value of land that is not depreciable. There is, therefore, $36,-452 of depreciable general property on which I allow the sum of 10 per cent., or $3,645.20 per annum to cover depreciation.

2. The master fixed and allowed the sum of $574,681.40 for annual depreciation on the production property, the depletion of wasting assets and amortization of the cost of developing leases, abandoned leases, producing leases, drilling dry holes, and of geological and scouting activities. All such costs and expenses are properly chargeable to operating expenses and should be spread over the life of the gas reserves because such costs are incident to the discovery and development thereof. The proof is that the plaintiff's gas reserve in 1932 was 126,250,203 MCF. The average annual production from this reserve for each of the four years of 1930 to 1933 inclusive was 12,911,444 MCF. If this rate of production should continue the reserve would be exhausted in 9¾ years. At the annual rate allowed by the master, plaintiff would recover during the period of exhausting its gas reserves the sum of $5,603,143.65, or $3,508,438.00 more than the present value of the production property. While it is true that there will be some additional expense, such as drilling wells, incurred in the future, in order to exhaust the present gas reserve, it is inconceivable that such additional expense will more than exceed the present value of all of plaintiff's production property.

While the amount charged upon the books of plaintiff might be either too large or too small, yet it should, and does, repre-sent the honest judgment of its experts, based upon their experience, of what is necessary to recoup this class of expenses. It is inconceivable that a utility, such as plaintiff, would knowingly make such a charge too small to amply cover such items of expense.

I am of the opinion, after weighing all facts and circumstances in proof, that the master's allowance of $574,681.40 is excessive for depreciation and depletion upon the production property of plaintiff and that the allowance made by the master should be reduced to $349,512.52.

The master disallowed an expense item of delayed rentals which I think was proper under the authority of Dayton P. & L. Co. v. Public Utilities Comm., 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267, and the Columbus Gas & Fuel Co. v. Public Utilities Comm., 292 U.S. 398, 54 S.Ct. 763, 78 L.Ed. 1327, 91 A.L.R. 1403.

3. The master allowed as annual depreciation upon the transmission property 5 per cent. of its value, or the sum of $1,314,-429.25. In my judgment this allowance is excessive.

In a transportation system of any gas company the chief factor of cost is that of the pipe lines. The master has given to this transmission system a service life of twenty years. He has stated no reason which prompted him to arrive at this figure, and I can find none in the testimony of the various experts who testified. The fact is, the testimony of the experts upon the life of pipe is very indefinite, some estimates carrying the life of pipe as high as seventy-five to one hundred years, while others reduce it to a very few years, but in no case was there any minimum estimate in term of years. Sixty per cent. in value of this transmission system has been constructed and in use at least five years, and the remainder for a much longer period, some of it as long as twenty-five years. The average weighted spent life of this property is certainly more than five years, yet the master found it to be in 90 per cent. overall condition. This would indicate that its rate of depreciation would not exceed 2 per cent. per annum. Yet, when the master allows 5 per cent. per annum, the aggregate of his allowance would, in two years, equal all the depreciation he finds that has accrued upon the property since it was constructed. It is inconceivable to me that the annual allowance for depreciation should be so high that the rate payers should be charged in

two years time depreciation in an amount equal to all of the depreciation found in the property, although all of it has been constructed for as much as five years and some of it for twenty-five years.

The Supreme Court of the United States, in the case of Lindheimer et al. v. Illinois Bell Telephone Co., 292 U.S. 151, 54 S.Ct. 658, 664, 78 L.Ed. 1182, in discussing depreciation, said: "Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence. Annual depreciation is the loss which takes place in a year. In determining reasonable rates for supplying public service, it is proper to include in the operating expenses, that is, in the cost of producing the service, an allowance for consumption of capital in order to maintain the integrity of the investment in the service rendered. The amount necessary to be provided annually for this purpose is the subject of estimate and computation." Knoxville v. Knoxville Water Co., 212 U.S. 1, 29 S.Ct. 148, 53 L. Ed. 371; Kansas City Ry. Co. v. U. S., 231 U.S. 423, 34 S.Ct. 125, 58 L.Ed. 296, 52 L. R.A.(N.S.) 1; Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255.

"Since depreciation is the loss not restored by current maintenance," it is axiomatic that high maintenance costs means low depreciation and vice versa. Therefore, the maintenance practice of any utility has a great bearing upon the rate of depreciation that should be allowed.

The authorities are in accord in holding that the depreciation allowance should be sufficient not only to take care of wear and tear and decay incident to the use of the property, but that consideration should be given to retirements occasioned by obsolescence and inadequacy.

The factor of wear and tear and decay, by reason of the experience of users of various classes of property included in a complete transmission plant, is not difficult to determine when one is acquainted with the use and value of the property. However, the question of allowance necessary to take care of obsolescence and inadequacy is very difficult. In fact, one's conclusions upon these factors can hardly be more impressive than that of a mere guess. Science and invention tomorrow may make obsolete that which today was practical and effective. Whether such a contribution will be made is a matter confined exclusively to the realm of speculation.

The same is true of inadequacy. It is governed wholly by the expansion of the business, which largely depends upon the growth and expansion of the communities which the plant serves.

The factor of obsolescence is not very material in connection with the operation of a gas transportation system. There has been but little improvement made in the matter of laying and joining pipe or the operation and use of the pipe after it is laid. The factor of inadequacy in the case at bar is likewise entitled to a little consideration. Before a pipe line system would become inadequate, the demand for gas upon it must exceed its operating capacity. While the record in this case does not show the amount of gas which the pipe line system of plaintiff is capable of efficiently handling in any twenty-four hour period, the record does show that the peak day demand of plaintiff's system during the four years under investigation occurred in 1930 and that such demand was 213,961 MCF. The average peak day demand during the four years in question which was used by the master in the allocation of costs, and will be used by me, is 167,622 MCF. The peak day demand of the plaintiff in the year of 1933, the last year under examination, was 148,950 MCF. Thus, it is seen that the demands upon plaintiff's pipe line system can increase 45 per cent. over what it was in 1933 and still not exceed the actual demand at one time experienced by the system.

The engineers seem to make a distinction between the amount to be allowed for observable depreciation and the amount which should be placed in the depreciation reserve, and with this I find myself in agreement. In estimating the amounts to be placed in the depreciation reserve, the calculations are designed to evenly distribute the loss over the estimated service life of the property.

Two methods of determining the annual amount of depreciation allowance for the transportation system have been suggested in this case. One is known as the "sinking fund" method and the other as the "straight line" method. Each of these methods are so well understood by the utilities, and those engaged in the regulation thereof, that it is not necessary at this time to enter into an explanation of the two methods. The master adopted the straight line method and in this respect I am in accord.

After giving consideration to the testimony of the witnesses with respect to the service life of the transportation system, I am of the opinion that the average service life of the transportation properties is not less than twenty-five years.

In Ohio there has been a great deal of litigation over gas rates, both in the courts and before the regulator commission of that state. The Ohio commission in recent years has had occasion to pass upon the value of depreciable property in three different cases. In two of these cases the commission made an allowance of 1.5 per cent. for depreciation and in the other case they made an allowance of 1.12 per cent. The Oklahoma commission and the Texas commission, both in recent cases, made an allowance for depreciation of 3 per cent.

While it is true that this, and no other court, is not required to follow findings made by regulatory commissions, yet the holdings of these commissions indicate the trend of thought of those trained and experienced in finding and fixing rates for depreciation.

After giving consideration to all the facts and circumstances in testimony. having any bearing upon what would be a reasonable allowance for the annual depreciation for the transportation system of the plaintiff, I am of the opinion that such facts and circumstances do not justify an allowance in excess of 3 per cent. of the present value of the transportation property of the plaintiff for annual depreciation. I am further of the opinion that the allowance of 3 per cent. is not only ample to take care of the diminution in value because of wear and tear, but also the cost of retirements occasioned by obsolescence and inadequacy.

4. The master allowed 5 per cent. of the value of the depreciable property in the Texarkana, Ark., distribution system to cover annual depreciation. It is my opinion that this allowance is also excessive. The proof is that a large part of the pipe in the distribution system at Texarkana is what is known as "cast iron," originally laid for the purpose of distributing artificial gas. The proof further shows that no one seems to know just how long cast-iron pipe will remain in an efficient operating condition buried in the ground. Its life has been variously estimated by the engineers testifying in this record at from seventy-five to one hundred years. Such pipe certainly has a much longer service life than

wrought steel pipe. This distributing plant has been operating for a long period of years, and its present suitable efficiency is not challenged. There is an element of permanency in this plant which should be considered in determining the depreciation. In the case of Dayton Power & Light Co. v. Ohio Public Utilities Comm., 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267, the commission's allowance of 2 per cent. of the value of depreciable property of a natural gas distribution system for annual depreciation was sustained.

In discussing the depreciation allowance for the distribution system, much that has been heretofore said with respect to the factors that should be given consideration in determining such an allowance is applicable, and it is not necessary at this point to make a repetition of what has heretofore been said.

Taking into consideration the life of cast-iron pipe and all other facts and circumstances in the testimony bearing upon and having any relation to the annual depreciation allowance for the distribution properties at Texarkana, Ark., I am of the opinion that 2% of the depreciable property is adequate and ample.

### Income Taxes.

Income taxes, both state and federal, are proper expense allowances. Galveston Electric Co. v. Galveston, 258 U.S. 388, 42 S.Ct. 351, 66 L.Ed. 678; Georgia Railway & Power Co. v. Railroad Comm., 262 U.S. 625, 43 S.Ct. 680, 67 L.Ed. 1144. The defendant contends no allowance should be made for income taxes due to the fact that the company has not paid any income taxes for some time. However true this may be, the rate of return would render the new consolidated companies subject to the payment of the income taxes, and, therefore, a proper allowance should be made for this expense.

The master in his report says: "Prior to last year, affiliated companies were permitted to file consolidated returns, hence the pipe line company paid no income tax as a separate unit. Under a new ruling it was required to file a separate return last year. Owing to the merger of last November, it will not, as a separate unit, be required to pay these taxes."

Notwithstanding this statement, the master, for income tax purposes, treated the pipe line department of the company, as well as its distribution operations in Tex-

arkana, as separate and distinct companies, and applied the tax rate to the net revenue necessary to avoid confiscation, after taking therefrom allowable deductions in calculating income tax.

■ In the case at bar, the rate-making authority (that is, the city council of Texarkana) has jurisdiction over only a small portion of plaintiff's operations and property. If plaintiff's rates in any of the several other cities in Arkansas, Louisiana, and Texas, in which it distributes gas, are such that result in an operating loss, while its rates in Texarkana produce a revenue, the plaintiff in making its income tax returns would be entitled to offset its losses against its revenues and would pay an income tax on the net revenues resulting from all of its operations, and not upon that resulting from a portion of its operations. In confiscation cases a utility should be permitted to charge into operating expenses only that amount of income taxes which would be payable after the utility has taken advantage of every deduction from gross income allowed by law. Confiscation should not be predicated upon an item of expense when the expense is never incurred. In the case at bar, no proof was introduced before the master that the plaintiff had, or would ever have, to pay an income tax. The master would perhaps have been justified in making no allowance for income taxes in view of the state of the record, but during the oral argument upon exceptions to the master's report, the court called upon the plaintiff to file as a part of the record in this case a statement showing the amount of income taxes it had paid or would pay upon its income for the year 1935. In response to this request the plaintiff filed a statement showing that the federal tax upon the 1935 net income was $81,311.05. This tax should not be figured at the rates provided for in the Revenue Act of 1936 (49 Stat. 1652), for those rates apply only to taxable years beginning after December 31, 1935. The defendant, in submitting calculations of income taxes based upon the 1935 revenue, states the federal tax to be $88,142.96, and that the state income tax is $8,205.01, making a total of $96,347.97. I think this latter amount should be adopted.

### Rate of Return.

■ The city council allowed a return on their valuation of 6 per cent. The plaintiff contended for a return of 8 per cent. on their transmission lines and 10 per cent.

on their production and distributing properties, while the defendant contended for a rate of return as made by the council on the production, transmission, and distributing property. The master allowed a return of 8 per cent. on all the properties. What will constitute a fair return in any specific case is more or less a matter of approximation, and the court must determine this amount to the best of its ability in the exercise of an independent judgment as to both the law and the facts. Ohio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 289, 40 S.Ct. 527, 528, 64 L.Ed. 908; Bluefield Water Works & Improv. Co. v. Public Service Comm., 262 U.S. 679, 689, 692, 43 S.Ct. 675, 678, 67 L.Ed. 1176; Leigh Valley R. Co. v. Public Utility Com'rs, 278 U.S. 24, 36, 49 S.Ct. 69, 73, 73 L.Ed. 161, 62 A. L.R. 805; United R. & Electric Co. v. West, 280 U.S. 234, 50 S.Ct. 123, 125, 74 L.Ed. 390.

In United R. & Electric Co. v. West, supra, it was held: "A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally."

■ The hazards of the occupation is likewise to be considered in arriving at a proper rate of return. The general rule is fairly laid down in Willcox v. Consolidated Gas Co., 212 U.S. 19, 29 S.Ct. 192, 198, 53 L.Ed. 382, 48 L.R.A.(N.S.) 1134, 15 Ann. Cas. 1034: "There is no particular rate of compensation which must, in all cases and in all parts of the company, be regarded as sufficient for capital invested in business enterprises. Such compensation must depend greatly upon circumstances and locality; among other things, the amount of risk in the business is a most important factor, as well as the locality where the business is conducted, and the rate expected and usually realized there upon investments of a somewhat similar nature with regard to the risk attending them. There may be other matters which, in some cases, might also be properly taken into account in determining the rate which an investor might properly expect or hope to receive and which he would be entitled to without legislative interference. The less risk, the less right to any unusual returns upon the investments. One who invests his money in a business of a somewhat hazardous character is very properly held to have the right to a larger return, without legislative interference, than can be obtained from an in-

vestment in government bonds or other perfectly safe security."

This property was principally constructed in 1929 and 1930, at a time when price levels were very high. The company enjoys, for all practical purposes, a monopoly in its line of business in the territory affected. The hazards of this industry are reduced to a minimum when compared to experiences of other companies engaged in the same industry. The only competition arising out of the availability of cheaper fuels.

When the price levels of 1929 and 1930, the time this company did most of its construction work, are compared with the price levels of today, a 6 per cent. rate would be a substantial increase based on the price levels of today over those of 1929 and 1930. There has been within the last few years a decided decrease in the rate interest in this section of the country. State securities and municipal securities in Arkansas have been refunded on a reduced interest rate. Securities of individuals and corporate entities have likewise undergone a reduction in interest rates. Taking into consideration these economic conditions and the present corporate earnings in this and other industries, I am forced to conclude that the city council did not act arbitrarily and fix the rate of return so unreasonably low as to contribute to a confiscatory rate. The Supreme Court has held that a rate order which was confiscatory at the time it was made may cease to be confiscatory, or one which is valid when made may become confiscatory at a later period. Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255; Des Moines Gas Co. v. Des Moines (D.C.) 199 F. 204; Lincoln Gas Co. v. Lincoln, 250 U.S. 256, 39 S.Ct. 454, 63 L.Ed. 968. The rate of 6 per cent. allowed by the city council should apply to the production and transmission properties and to the distributing plant.

### Cost of Gas at Town Border.

Having determined and fixed the costs of plaintiff incident to the production and transmission of gas through its pipe line system to its consumers, and the gateway of the several distribution systems served, for convenience, these costs will now be grouped into commodity and demand costs. This is necessary in order to distribute equitably the cost of production and transportation of gas among the consumers thereof.

There is a wide variance between the plaintiff, the defendant, and the master in the method to be adopted in making the calculation of the cost of gas at the city gate or town border of Texarkana. It is the defendant's contention that the cost of gas at the city gate should be obtained by dividing the production and transmission cost by the total volume of gas handled, giving effect only to the annual volume. It is the plaintiff's contention that in addition to this factor there should be considered in determining the cost of gas to be delivered to domestic and commercial consumers, a demand factor. The master's theory differs from both. He follows the method laid down by the fact-finding tribunal for the state of Arkansas in which is known as the "Stuttgart Rate' Case." His method eliminates all consideration of industrial gas sold through the distribution system from his calculations except an arbitrary profit of 3 cents per thousand cubic feet.

Applying his method to the findings he made, the master would establish a higher rate than would result from the methods adopted by either the plaintiff or defendant, and higher still than any rate sought by the company from the city. His conclusions make his rate higher than the rates asked for by the company in its application to the city in 1930 or 1933 and would exceed the present rates which the company is now charging after the temporary restraining order in this case was granted. I am of the opinion that gas companies can usually be depended upon to apply for rates which are not confiscatory, and I am constrained to challenge the weight to be given to the master's conclusions when they are higher than the rates asked for by the plaintiff. Although the master's findings were advantageous to the plaintiff, it waived them and asked that the methods it submitted be adopted, and its methods were accordingly accepted by the master.

The demand cost method is based on the theory that the utility must keep in readiness sufficient facilities for supplying the highest demand that may be made upon it for gas in any one day. The domestic and commercial consumer's usage is largely for space heating purposes and they experience their greater use on some day during the winter months, while the consumption of such gas falls to a minimum during the summer months. Notwithstanding this fluctuation the plaintiff is compelled to maintain its pipe lines, together with other

facilities, and an adequate personnel throughout the entire year. I think that this factor should be taken into consideration in·determining the town border cost of gas. There are certain items of expense, which, in fairness, could not be equitably apportioned without using this factor, while the very nature of other items of expense yield themselves to the proportionate sales basis.

In the case of United Fuel Gas Co. v. Railroad Comm. (D.C.) 13 F.(2d) 510, 522, the court held: "We are of the opinion that production expenses and valuation, general property valuation, general expenses, and working capital should be apportioned on the proportionate sales basis, transmission, system valuation, and expenses upon the demand mileage basis, and distribution upon actual valuation of the distribution plants in the several municipalities and actual expenses there incurred."

This well-reasoned opinion, it seems to me, gives proper weight in the distribution of cost to both methods, combining them into what might be termed a "commodity demand basis." There is no proof in this record concerning the mileage. Therefore, the calculations cannot be made upon the demand mileage basis, but will be made upon the demand basis, without consideration of mileage. Following the rule quoted, I have made the following allocation of commodity and demand costs and assigned to each those items clearly indicated by the quoted language that should be incorporated herein:

### Commodity Cost

| | | |
|---|---|---:|
| Production operation, maintenance, severance taxes and royalties | | $ 110,579.80 |
| General expense | | 133,989.83 |
| Taxes | | 4,100.00 |
| Depletion, depreciation and annual charge for amortization of cost of gas reserves | | 349,512.52 |
| Return on: | | |
| Cash working capital | $ 750,000 | |
| Production property | 2,094,605 | |
| General property | 59,341 | |
| Going value | 941,590 | |
| | $3,845,536 @ 6% | 230,732.16 |
| Depreciation general property | | 3,645.20 |
| Federal and state income taxes | | 96,347.97 |
| Cost of gas purchased | | 1,212,350.54 |
| Total | | $2,141,258.02 |
| Less: Profits from Palmer gas | | 103,883.01 |
| Total commodity cost | | $2,037,375.01 |

The net total amount of gas handled by the production and transmission system for each of said four years averaged 38,838,580 M.C.F. The total commodity cost divided by the total gas handled results in a commodity cost of $0.05247 per M.C.F.

### Demand Cost

| | | |
|---|---|---:|
| Transmission line maintenance | | $ 420,488.84 |
| Compressor station expense | | 193,050.75 |
| Taxes | | 351,330.97 |
| Depreciation at 3% transmission system | $23,488,738 | 704,662.14 |
| Return at 6% transmission system | $23,488,738 | 1,409,324.28 |
| Total demand cost | | $3,078,856.98 |
| Less: Credit | | |
| Gas used by company | $69,177.69 | |
| Net earnings from gasoline plants | 5,191.50 | 74,369.19 |
| Total net demand cost | | $3,004,487.79 |

The average peak day demand for each of said 4 years was 167,622 M.C.F. The total net demand cost divided by the average peak day demand gives a demand cost per M.C.F. of $17.92.

### Leakage.

It is admitted, and found by the master, that there was excess leakage or waste of gas through the distribution system in Texarkana. This leakage has, during each of the said four years, averaged 126,272 MCF. It seems to me that the amount of leakage which the plaintiff is experiencing is ample evidence of waste and negligence. This is more than 29 per cent. of all the gas sold and delivered through the system.

It is conceded that it is impossible to maintain a natural gas distribution system so as to avoid all leakage. Therefore, it is necessary to adopt some standard by which the amount of permissible leakage may be measured.

The plaintiff contends that permissible leakage is equal to 1,000 MCF per mile of pipe of 3″ equivalent, and the master allowed this amount. On this basis the excess leakage at Texarkana amounts to 45,020 MCF per annum. The city, in fixing rates which the plaintiff might charge for gas, allowed 10 per cent. for leakage. On the basis allowed by the city, the excess leakage amounts to 79,089 MCF per annum.

I am of the opinion that by the exercise of ordinary care the leakage could be held to 10 per cent. and that the public should not have to pay for leakage in excess of that figure. I, therefore, find that the excess leakage in the Texarkana distribution system is 79,089 MCF per annum.

For the purpose of determining the cost of gas at the city gate, it is necessary to group the customers. Therefore, for the purpose of this opinion, domestic, commercial, company-used, and free gas will be placed in one classification, leakage in another, and industrial customers in another. The average peak day demand for domestic, commercial, company-used, and free gas in Texarkana during the four-year period covered by this investigation was 2,560 MCF and the leakage demand was 345 MCF. The total average town border delivery of gas to the distribution system used for domestic, commercial, including free and company-used gas was 263,785 MCF. There was turned into the city distribution system and leaked or wasted therefrom 126,272 MCF. By applying the demand and commodity cost hereinbefore fixed, the cost of gas at the city gate may be determined.

Following is a calculation of the cost of all gas at the town border of Texarkana, Ark., based upon the items of expenses and costs hereinbefore approved by me:

The record does not show the average peak day demand for industrial gas sold through the distribution system in Texarkana, Ark., but it shows such demand to be 2,068 MCF for Texarkana, U. S. A., and the average annual town border delivery of industrial gas to Texarkana, U. S. A., is 705,069 MCF. The record also shows that of the 705,069 MCF, 160,857 MCF was sold and distributed through the Texarkana, Ark., plant. It will be noted on the preceding calculation that the average cost of industrial gas at Texarkana, U. S. A., is 10.5 cents per MCF. If this cost is applied to the 160,857 MCF of industrial gas sold through the Texarkana, Ark., distribution system, it will be found that the aggregate cost of such gas was $16,889.99. The proof is that this gas was sold to the consumers for $29,458.73.

I find that the distribution operations at Texarkana, Ark., should be charged with the cost of industrial gas in the sum of $16,889.99 and the distribution revenue credited with $29,458.73, the amount received from the sale of such gas.

| | Col. 1 Domestic Commercial Free and Company Used | Col. 2 Leakage | Col. 3 Total Col. 1 And Col. 2 | Col. 4 Industrial Texarkana, U.S.A. |
|---|---|---|---|---|
| 1. Average peak day demand (MCF) | 2,560 | 345 | 2,905 | 2,068 |
| 2. Demand cost per MCF, average peak day delivery (Cal. No. 1) | $ 17.92 | $ 17.92 | $ 17.92 | $ 17.92 |
| 3. Total demand cost (Line 1 × Line 2) | 45,875.20 | 6,182.40 | 52,057.60 | 37,058.56 |
| 4. Total annual town border delivery MFC | 263,785 | 126,272 | 390,057 | 705,669 |
| 5. Commodity cost per MFC (Cal. No. 2) | $ 0.05247 | $ 0.05247 | $ 0.05247 | $ 0.05247 |
| 6. Total commodity cost (Line 4 × Line 5) | 13,840.80 | 6,625.49 | 20,466.29 | 36,994.97 |
| 7. Total cost gas delivered at town border (Line 3 + Line 6) | 59,716.00 | 12,807.89 | 72,523.89 | 74,053.53 |
| 8. Average cost per MCF annual delivery (Line 7 ÷ Line 4) | 0.2264 | 0.1014 | 0.1859 | 0.1050 |
| 9. Annual town border delivery, industrial gas at Texarkana, Ark. | | | | 160,857 |
| 10. Cost of industrial gas, Texarkana, Ark. (Line 9 × Line 8) | | | | $16,889.99 |
| 11. Cost of excess leakage (79089 × 0.1014) | | 8,019.62 | 8,019.62 | |
| 12. Town border cost less excess leakage | 59,716.00 | 4,788.27 | 64,504.27 | 16,889.99 |

■ The master credited distribution operations with $5,848.04 upon the theory that this was all the profit arising from the sale and distribution of industrial gas through the distribution system. In this the master erred. While it is true that the plaintiff has been charging the distribution system and crediting its pipe line operations with the amount for which the distribution system sold industrial gas, less 3 cents per MCF, and the credit of $5,848.04 is the aggregate of the profit allowed the distribution system on account of industrial gas.

### Operating Costs of Distribution System.

■ The only item of cost of the distribution system allowed by the master, and about which there is any controversy aside from depreciation and return, is general expenses. The master allowed for this item $19,427.65. Included in this amount is $3,077.49, consisting of "Employees' Subscription Plan Bonus" expense and "New York Administrative Expenses." Both of these items were disallowed early in this

opinion in connection with the general expenses of the production and transportation systems and will again be disallowed. I find that the general expenses chargeable to distribution operations is $16,350.16. Heretofore in this opinion I have fixed the rate of return and depreciation on the property in the distribution system.

I find the cost of operating the distribution system at Texarkana, Ark., to be $140,822.07, made up of the following items, to wit:

| | |
|---|---|
| Town border cost, domestic commercial and leakage | $ 64,504.27 |
| Town border cost, industrial gas | 16,889.99 |
| Local expense | 17,717.07 |
| General expense | 16,350.16 |
| Bad debts | 1,970.16 |
| Depreciation 2% on $292,973.00 | 5,859.46 |
| Return 6% on $321,973.00 | 19,318.39 |
| Subtotal | $142,610.26 |
| Less: Forfeited discounts | 1,728.19 |
| Total | $140,882.07 |

The master found the gross revenues arising from the rates established by the ordinance of February 13, 1934, referred to in the record as the "40¢ rate," and which, added to the $29,458.73, the income from industrial gas, would produce $129,069.98. Under the 45-cent rate the master found the average gross revenues for the years 1930, 1931, 1932, and 1933, would be $112,101.58. The testimony discloses that the average receipts for this four-year period from industrial gas was $29,458.73. Thus, the $112,101.58 plus $29,458.73 would yield $141,560.31. It will be seen that this income is less than $1,000 more than the expenses. Rate making has not reached that point of mathematical certainty that the court would be able to say that in any case involving more than $25,000,000 of property and $5,000,000 of expense, the small amount of difference between income and expenses is the difference between confiscation and validity. Rates are never figured that close. However, the difference in this case is in favor of the validity of the city ordinance.

After careful study of the testimony and exhibits upon which the master bases these revenue findings, I am convinced that a proper calculation of the revenues would be slightly in excess of this amount. The rates fixed by the city council provided for a reduction after a certain amount of gas has been consumed each month. It would seem that an accurate estimate of the revenues available under the rates could only be made after it is ascertained how much gas has been or will be consumed in each rate block each month. I do not find in the record any satisfactory calculation along this line. There is a calculation applying only to one year, and then applying to the commercial and domestic gas consumed in both Texarkana, Ark., and Texarkana, Tex. There are special contracts in existence between the company and some of the larger commercial users which provide special rates. I think the more just computation would be to compute the total average sales of gas affected by the rate fixed by the city council. The total average sales of gas affected by these rates over the four-year period have been 259,865 MCF. If this method of computation be adopted it would increase the revenues on the 40-cent rate to $133,404.73. The 45-cent rate would produce on this computation $146,397.78. Under these computations it will be noted that the revenue from the 40-cent rate is insufficient to pay the operating expenses of the company, including depreciation as return herein fixed. On the other hand, under the computation of the master, the so-called 45-cent rate exceeds such costs by several hundred dollars.

Both the 40-cent and the 45-cent rates are involved in this litigation and the enforcement of each was temporarily enjoined in this proceeding. The record clearly discloses that the 40-cent rate embodied in the ordinance of February 13, 1934, is confiscatory and is, therefore, invalid. The invalidity of the ordinance of February 13, 1934, would leave the 45-cent rate established by the resolution of December, 1933, in effect, and since this rate produces sufficient revenue to meet the operating expenses of the distribution system at Texarkana, including depreciation and return, I find that the 45-cent rate is valid and effective.

Counsel for defendant are directed to prepare and present findings of fact and conclusions of law in conformity with the views expressed in this opinion and to present a decree to the same effect.